**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Ernest Raymond BASURTO et al.,
Defendants-Appellants.**

**Nos. 72–2781, 72–2612, 72–2679.**

United States Court of Appeals,
Ninth Circuit.

May 10, 1974.

Rehearing Denied July 19, 1974.

Mickey L. Clifton (argued), Phoenix, Ariz., for defendants-appellants in 72–2781.

David S. Hoffman, Asst. U. S. Atty. (argued), William C. Smitherman, U. S. Atty., Tucson, Ariz., for plaintiff-appellee in all three cases.

John J. Flynn (argued), Michael D. Kimerer, Flynn, Kimerer, Thinnes & Galbraith, Phoenix, Ariz., for defendant-appellant in 72–2679.

Ronald W. Sommer (argued), Tucson, Ariz., for defendant-appellant in 72–2612.

Before HUFSTEDLER and WRIGHT, Circuit Judges, and FERGUSON,* District Judge.

FERGUSON, District Judge:

Appellants and 14 others were charged in a one-count indictment with conspiring to import and distribute marijuana, in violation of 21 U.S.C. §§ 176a, 841 and 952. The conspiracy was alleged to have occurred between February 1, 1971 and December 4, 1971, and to have involved smuggling marijuana from Mexico into the United States by airplane. Following the denial of motions to suppress evidence and to dismiss the indictment, appellants were convicted of the charged offense after a jury trial. We reverse.

The issues presented by these appeals include: (1) the duty of the prosecuting attorney following pre-trial disclosure of perjury before the grand jury; (2) the nature of "exigent circumstances" which will make the warrantless search of a home constitutionally permissible; (3) the applicability of the "harmless error" rule set forth in Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); (4) the search of a wallet; and (5) the sufficiency of the evidence to sustain a conviction.

### Perjury By A Witness Before The Grand Jury

William Barron was named in the indictment as a co-conspirator but not a defendant. He testified as to appellants' activities in the conspiracy before the grand jury which brought the indictment. Prior to the commencement of trial, Barron informed the Assistant United States Attorney prosecuting the case that he had committed perjury before the grand jury in important respects. In particular, he told the prosecutor that all his grand jury testimony relating to his knowledge of appellants' activites in the conspiracy prior to May 1, 1971, was untrue. That date is significant, because effective then 21 U.S. C. § 176a was repealed by the Comprehensive Drug Abuse Prevention and Control Act of 1970, Pub.L. 91–513, 84 Stat. 1236, 21 U.S.C. § 801 et seq., Persons convicted of narcotics offenses under 21 U.S.C. § 176a were subject to a mandatory minimum sentence of five years, while those convicted under the new statute were not subject to such inflexible sentencing.

The only witness other than Barron to testify before the grand jury as to appellants' activities in connection with the conspiracy prior to May 1, 1971, was Thomas Waddill, a Customs agent. Both Barron's and Waddill's testimony was unrecorded. The parties dispute whether Agent Waddill, at the time of his grand jury appearance, had any knowledge of appellants' activities prior to May 1, 1971, other than what Barron had told Waddill.[1]

Upon learning of Barron's perjured grand jury testimony, the prosecuting attorney informed opposing counsel. He did not, however, notify the court or the grand jury. In his opening statement at trial, he made reference to Barron's perjury before the grand jury, but sought to minimize its scope and importance:

"Mr. Barron did testify at the Grand Jury, but part of his testimony was a lie. Mr. Barron will take the stand and tell you that today, or ex-

---

* Honorable Warren J. Ferguson, United States District Judge, Central District of California, sitting by designation.

1. It is not necessary that the dispute be resolved, since it does not affect the holding of this court. The issue here is not one relating to the sufficiency of evidence before a grand jury to sustain an indictment, but rather, the duty of a prosecutor when he becomes aware that perjury as to a material matter has been committed.

cuse me, when he takes the stand. He will tell you he lied about where he met Buddy Wilson, Buddy Waggoner, the man seated here in the brown suit. He will tell you that the reason he told this lie is he was protecting a friend of his in Seattle, Washington. He will tell you that other than minute details which he has since recalled, such as a change in a date or a change in possibly who was present at exactly a particular moment, other than those details this is the only material lie that he told before the Grand Jury, but it was a lie. He will tell you that when he takes the stand in this trial he will tell the truth."

The conduct of the prosecutor in this case reinforces the expression by Professor Moore that, over the years, the government prosecutor has gained substantial influence over the grand jury, and subsequently that institution has lost much of its former independence. See 8 J. Moore, Federal Practice, ¶ 6.02[1].

■ The Fifth Amendment provides that "[n]o person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury." The purpose of that requirement is to limit a person's jeopardy to offenses charged by a group of his fellow citizens acting independently of either the prosecutor or the judge. Stirone v. United States, 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960).

■ It is clear, however, that when a duly constituted grand jury returns an indictment valid on its face, no independent inquiry may be made to determine the kind of evidence considered by the grand jury in making its decision. Costello v. United States, 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397 (1956). To do so would further invade the independence of the grand jury. The holding reached by this court does not affect that established rule.

■ Today, the grand jury relies upon the prosecutor to initiate and prepare criminal cases and investigate which come before it. The prosecutor is present while the grand jury hears testimony; he calls and questions the witnesses and draws the indictment. With that great power and authority there is a correlative duty, and that is not to permit a person to stand trial when he knows that perjury permeates the indictment.

■ At the point at which he learned of the perjury before the grand jury, the prosecuting attorney was under a duty to notify the court and the grand jury, to correct the cancer of justice that had become apparent to him. To permit the appellants to stand trial when the prosecutor knew of the perjury before the grand jury only allowed the cancer to grow.

As we have noted above, the perjury before the grand jury was material because of the change in the law; all of Barron's grand jury testimony relating to the appellants' activities before May 1, 1971 was perjured. The grand jury, if it returned an indictment, might have done so under the Comprehensive Drug Abuse Prevention and Control Act of 1970, *supra* had it known of the perjury.

We also note that jeopardy had not attached at the time the prosecutor learned of the perjured testimony, nor had the statute of limitations for the offenses charged run. Under Illinois v. Somerville, 410 U.S. 458, 93 S.Ct. 1066 35 L.Ed.2d 425 (1973), if the prosecutor had brought the perjury to the court's attention before the trial commenced and the indictments had been dismissed, the Double Jeopardy Clause of the Fifth Amendment would not have barred trial under a new indictment.

■■ We hold that the Due Process Clause of the Fifth Amendment is violated when a defendant has to stand trial on an indictment which the government knows is based partially on perjured testimony, when the perjured testimony is material, and when jeopardy has not attached. Whenever the prosecutor learns of any perjury committed before the grand jury, he is under a

duty to immediately inform the court and opposing counsel—and, if the perjury may be material, also the grand jury —in order that appropriate action may be taken.

■ We base our decision on a long line of cases which recognize the existence of a duty of good faith on the part of the prosecutor with respect to the court, the grand jury, and the defendant. While the facts of these cases may not exactly parallel those of the instant case, we hold that their rulings regarding the consequences of a violation or abuse of this prosecutorial duty must be applied where the prosecutor has knowledge that testimony before the grand jury was perjured. *See* Mooney v. Holohan, 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791 (1935) ; Giles v. Maryland, 386 U.S. 66, 87 S.Ct. 793, 17 L.Ed.2d 737 (1967) ; Napue v. Illinois, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959) ; Alcorta v. Texas, 355 U.S. 28, 78 S.Ct. 103, 2 L. Ed.2d 9 (1957) ; Hysler v. Florida, 315 U.S. 411, 62 S.Ct. 688, 86 L.Ed. 392 (1942) ; Pyle v. Kansas, 317 U.S. 213, 63 S.Ct. 177, 87 L.Ed. 214 (1942).

In Napue v. Illinois, *supra*, the Supreme Court reaffirmed the principle stated in many of its prior decisions that

"a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment, [citations]. The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears. [Citations.]" .360 U.S. at 269.

The Court reiterated "[t]he principle that a State may not knowingly use false evidence, including false testimony, to obtain a tainted conviction, implicit in any concept of ordered liberty . . . ." *Id. See* Giles v. Maryland, *supra*, at 74.

The Court held in *Napue* that the prosecution's use of known false testimony at trial required a reversal of the pe-

titioner's conviction. The same result must obtain when the government allows a defendant to stand trial on an indictment which it knows to be based in part upon perjured testimony. The consequences to the defendant of perjured testimony given before the grand jury are no less severe than those of perjured testimony given at trial, and in fact may be more severe. The defendant has no effective means of cross-examining or rebutting perjured testimony given before the grand jury, as he might in court.

In Mesarosh v. United States, 352 U. S. 1, 77 S.Ct. 1, 1 L.Ed.2d 1 (1956), while a review of the petitioners' convictions was pending in the Supreme Court, the Solicitor General informed the Court of indications he had just received that one of the government's witnesses at trial had testified falsely in other proceedings. While the government believed that the witness' testimony at trial "was entirely truthful and credible," it suggested a remand to the district court for a determination of the credibility of the witness' testimony. Solely on the basis of the government's representations, the Supreme Court reversed the convictions and directed that petitioners be granted a new trial. The Court stated, *inter alia*, that

"Mazzei [the witness], by his testimony, has poisoned the water in this reservoir, and the reservoir cannot be cleansed without first draining it of all impurity. . . . Pollution having taken place here, the condition should be remedied at the earliest opportunity.

" 'The untainted administration of justice is certainly one of the most cherished aspects of our institutions. Its observance is one of our proudest boasts. . . . [F]astidious regard for the honor of the administration of justice requires the Court to make certain that the doing of justice be made so manifest that only irrational or perverse claims of its disregard can be as-

serted.' Communist Party v. Subversive Activities Control Board, 351 U.S. 115, 124, 76 S.Ct. 663, 668 [100 L.Ed. 1003]."

352 U.S. at 14.

Permitting a defendant to stand trial on an indictment which the government knows is based on perjured testimony cannot comport with this "fastidious regard for the honor of the administration of justice."

Because the prosecuting attorney did not take appropriate action to cure the indictment upon discovery of the perjured grand jury testimony, we reverse appellants' convictions.

While this ground alone requires reversal of the convictions, other issues raised on appeal are sufficiently important to merit consideration.

### Search of Basurto's Home Following his Arrest

Appellant Basurto was arrested in front of his home by two Customs agents. After he was placed under arrest, Basurto turned toward the house and yelled, "It's the police." Immediately, Agent Waddill, who did not have a search warrant, ran to the front door, opened it and entered the house. He testified that he entered the house to see if anyone was inside, and to see if anyone inside had any weapons. The purpose of the entry, according to Agent Waddill's testimony, was to protect himself, his fellow agent, and Basurto. At the time of the intrusion, Agent Waddill knew that Basurto had been in possession of a weapon during November or December of 1970 while trying to board an airplane at Tucson International Airport.

Upon entering the house, the agent observed someone in the living room. A

search of that person and of the room revealed no weapons. Agent Waddill testified that he observed some papers lying on a table in an adjoining kitchen with the figures "1,000 lbs." and "$30,000" on them, which he seized. He then searched other rooms in the house, seizing other items of evidence but finding no one else present.

The record indicates that while being transported to the county jail, Basurto was advised of his rights and was shown the papers seized from the kitchen table, and that he then made statements about various persons involved in narcotics smuggling activities.

Prior to trial, Basurto moved to suppress the items seized in the search of his house and his statements derived therefrom. The district court denied the motion to suppress the papers taken from the kitchen table but granted it as to all other items seized.[2] As to the documents on the kitchen table, the court ruled:

"I find that Officer Waddill was justified in promptly going into the house when he had noticed that there might be somebody there who could surprise them, and that he was justified in going into the kitchen also for the same purpose, and that the document or writing found on the kitchen table was in plain view."

The court ruled that any statements made by Basurto with reference to any of the items ordered suppressed were to be suppressed as well.

██ It is evident that the district court's finding that the papers on the kitchen table were "in plain view" does not by itself make the search and seizure of those papers constitutionally permissible.[3] As the Supreme Court

---

2. Basurto also moved unsuccessfully to suppress items taken from his person after his arrest. He does not appeal from the denial of his motion to suppress those items.

3. The district court's findings as to the plain view issue are not precise. The district court did not specifically find that the pa-

pers on the kitchen table were in plain view from the room into which Agent Waddill entered the house, although there was testimony by Agent Waddill to this effect. Rather, the court's finding was that the papers were in plain view once Agent Waddill entered the kitchen, and that his entry into the kitchen was justified. We assume, without deciding,

stated in Coolidge v. New Hampshire, 403 U.S. 443, 465, 468, 91 S.Ct. 2022, 2037, 2039, 29 L.Ed.2d 564 (1971):

"[I]n the vast majority of cases, *any* evidence seized by the police will be in plain view, at least at the moment of seizure. The problem with the 'plain view' doctrine has been to identify the circumstances in which plain view has legal significance rather than being simply the normal concomitant of any search, legal or illegal.

\* \* \* \* \* \*

"[P]lain view *alone* is never enough to justify the warrantless seizure of evidence. . . ."

Only if Agent Waddill was lawfully in Basurto's house at the time of the search, and then only if the papers on the kitchen table were in plain view,[4] were those papers and Basurto's statements derived from them lawfully admitted into evidence. As the Court pointed out in *Coolidge, supra*:

"What the 'plain view' cases have in common is that the police officer in each of them had a prior justification for an intrusion in the course of which he came inadvertently across a piece of evidence incriminating the accused. . . ." 403 U.S. at 466.

The question therefore becomes whether there was a sufficient prior justification for Agent Waddill's entry into the home after Basurto yelled, "It's the police."

■■■ We hold that the agent's entry into Basurto's home violated the Fourth Amendment, and that therefore the papers found on the kitchen table, and any statements made as a result thereof, should have been suppressed.

The Fourth Amendment provides, in part, "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated. . . ."

The difficulty in Fourth Amendment cases, of course, has been to determine which searches and seizures are "unreasonable" and which are "reasonable." In United States v. Rabinowitz, 339 U.S. 56, 70 S.Ct. 430, 94 L.Ed. 653 (1950), the Supreme Court emphasized that "[i]t is unreasonable searches that are prohibited by the Fourth Amendment," and held that the test of reasonableness "depends upon the facts and circumstances—the total atmosphere of each case." 339 U.S. at 60, 66. The *Rabinowitz* standard was expressly overruled, however, in Chimel v. California, 395 U.S. 752, 764–768, 89 S.Ct. 2034, 23 L.Ed. 2d 685 (1969). The Court in *Chimel* held that "the facts and circumstances" of the *Rabinowitz* test must be evaluated with the emphasis upon "established Fourth Amendment principles" rather than upon the pragmatics of police conduct. The Court stated that the government's "reasonableness" argument was

"founded on little more than a subjective view regarding the acceptability of certain sorts of police conduct, and not on considerations relevant to Fourth Amendment interests. Under such an unconfined analysis, Fourth Amendment protection in this area would approach the evaporation point. . . ." 395 U.S. at 764–765.

The sentence of the *Chimel* opinion following that quoted above relates to the fact situation of the instant case:

"It is not easy to explain why, for instance, it is less subjectively 'reasonable' to search a man's house when he is arrested on his front lawn—or just down the street—than it is when he happens to be in the house at the time of arrest. . . ." *Id.*, at 765.

Under *Chimel* and Vale v. Louisiana, 399 U.S. 30, 90 S.Ct. 1969, 26 L.Ed.2d 409 (1970), the entry and search in the instant case cannot be justified as being incident to a lawful arrest.

---

that the papers on the kitchen table were in plain view of Agent Waddill from the room into which he entered the house.

4. *See* note 3, *supra*.

The government contends that the warrantless entry and search of Basurto's home was justified since "exigent circumstances" existed which "required the officers, if they were to act reasonably, to enter the house for the protection of the prisoner and themselves." The district court implicitly agreed with the government's position in finding that Agent Waddill was "justified" in entering the house and going into the kitchen.

The government specifically contends that exigent circumstances such as those present in Warden v. Hayden, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967), were present in the instant case. But in that case, as the Supreme Court pointed out in Vale v. Louisiana, *supra*, 399 U.S. at 35, the officers were "in hot pursuit of a fleeing felon," and the warrantless search of the house was justified as an attempt to apprehend the missing felon and his weapons. In Warden v. Hayden, the Court detailed the circumstances which made the search reasonable in that case:

"The police were informed that an armed robbery had taken place, and that the suspect had entered 2111 Cocoa Lane less than five minutes before they reached it. They acted reasonably when they entered the house and began to search for a man of the description they had been given and for weapons which he had used in the robbery or might use against them. The Fourth Amendment does not require police officers to delay in the course of an investigation if to do so would gravely endanger their lives or the lives of others. Speed here was essential, and only a thorough search of the house for persons and weapons could have insured that Hayden was the only man present and that the police had control of all weapons which could be used against them or to effect an escape." 387 U.S. at 298–299.

While the officers in Warden v. Hayden were seeking a missing armed suspect who had been reported to have entered the house that was searched, in the instant case Basurto was not missing but was in fact already in police custody in front of his home. Since the particular facts which justified the search in Warden v. Hayden are completely lacking here, that case lends no support to the government's position.

In Vale v. Louisiana, *supra*, the Court detailed the types of circumstances which qualify as sufficiently "exigent" to justify a warrantless search of a home, stating that

"our past decisions make clear that only in 'a few specifically established and well-delineated' situations, Katz v. United States, 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576, may a warrantless search of a dwelling withstand constitutional scrutiny, even though the authorities have probable cause to conduct it. The burden rests on the State to show the existence of such an exceptional situation. Chimel v. California, *supra*, at 762, 89 S.Ct. 2039; United States v. Jeffers, 342 U.S. 48, 51, 72 S.Ct. 93, 95, 96 L.Ed. 59; McDonald v. United States, 335 U.S. 451, 456, 69 S.Ct. 191, 193, 93 L. Ed. 153. . . ." 399 U.S. at 34.

The circumstances considered "exigent" were stated to include responding to an emergency; the hot pursuit of a fleeing felon; the ongoing destruction of the goods ultimately seized; and the removal of those goods from the jurisdiction.

The facts of the instant case do not constitute "exigent circumstances" sufficient to justify the search. The factual bases relied upon by Agent Waddill in entering the house were that Basurto had had a weapon in his possession while attempting to board an airliner in the past and that he had yelled "It's the police" in the direction of the house after being placed under arrest. Neither of these facts provided any indication to the agents that there was anyone in the house who might harm them or that weapons were in the house. The government has not argued that Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L. Ed.2d 889 (1968) is applicable here, nor should this be occasion for widening the

scope of that decision. Basurto himself was under arrest and had been found not to have a weapon. His yelling "It's the police" strikes us as a normal and not unexpected response to his being placed under arrest. It is not unreasonable for an individual to call into his house to his friends or relatives that he is being taken away, so as to indicate to them the reason for his detention and sudden absence.

■■■ Since the facts and circumstances surrounding Agent Waddill's entry into the house do not fall within any of the exceptions which make a warrantless search of a dwelling constitutionally permissible, and since, under *Vale*, the government has the burden of proving the existence of such an exceptional situation, we hold that the entry into the home and the search of any part of it (including the kitchen table) violated the Fourth Amendment. The government concedes that under Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), if the seizure of the documents on the kitchen table was illegal, then any statements made by Basurto prompted by or regarding those documents must be suppressed. Accordingly, it was error to admit the papers seized from the kitchen table and Basurto's statements derived therefrom.

■■■ This determination does not end our inquiry, however. Under Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), a governmental violation of a defendant's constitutional rights does not require a reversal of the conviction if the violation constitutes "harmless error." The Court in *Chapman* adopted the test of Fahy v. Connecticut, 375 U.S. 85, 86–87, 84 S.Ct. 229, 11 L.Ed.2d 171 (1963), to determine whether an error is harmless: " 'The question is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction.' " 386 U.S. at 23. The Court concluded that "[a]n error in admitting plainly relevant evidence which possibly influenced the jury adversely to a litigant cannot, under *Fahy*, be con-

ceived of as harmless," and placed the burden on "the beneficiary of the error" (the government here) to prove beyond a reasonable doubt that the improperly admitted evidence did not contribute to the conviction. 386 U.S. at 23–24.

The record before us indicates that the papers seized from the kitchen table contained the figures "1,000 lbs." and "$30,000"; and that while en route to the county jail, and after having been advised of his rights, Basurto made statements about certain persons involved in narcotics smuggling activities. The district court made the following ruling with respect to the admissibility of Basurto's statements to the agents:

"I believe that the statements that he made to the agents were voluntary with this reservation: That as to any statements made by Mr. Basurto with reference to any items that [were ordered excluded] . . . any statements made by him with respect to those items . . . any statements made regarding those items are inadmissible as being produced as the result of the illegal search in the baby's room, the bedroom and the bedroom closet."

The following colloquy then ensued between the prosecutor and the court:

"[THE PROSECUTOR:] Your Honor, I have spoken with Mr. Waddill in conjunction with the Court's ruling and showed him the statements made . . . apparently none of those statements were made in conjunction with any of the items seized and suppressed by the Court.

"THE COURT: Well, I don't know, but I am laying out the ground rules accordingly."

■■■ The standard used by the court and the prosecutor to determine which statements should be suppressed was erroneous. The court ordered the exclusion of any statements "with reference to," "with respect to," or "regarding" the items it had ordered suppressed; the prosecutor stated that none of the statements made by Basurto

"were made in conjunction with" any of those items. Under Wong Sun v. United States, *supra*, however, any statements that were the *fruits* of any evidence wrongfully seized should have been excluded. The Supreme Court in that case held that

"verbal evidence which *derives* so immediately from an unlawful entry and an unauthorized arrest . . . is no less the 'fruit' of official illegality than the more common tangible fruits of the unwarranted intrusion. . . ." 371 U.S. at 485. (Footnote omitted.) [Emphasis supplied]

The Court relied upon Justice Holmes' statement in Silverthorne Lumber Co. v. United States, 251 U.S. 385, 392, 40 S. Ct. 182, 183, 64 L.Ed. 319 (1920), that "[t]he essence of a provision forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used before the Court but that it shall not be used at all. . . ." Thus, the test that should have been used in this case is that any statements made by Basurto that related to or were prompted by any inadmissible evidence, or that would not have been made but for the possession of such evidence by the government agents, were the "fruits" of, were derived from, such evidence and should have been excluded.

 The government admits that "[t]he documents which the appellant Basurto contends were erroneously admitted into evidence and *which were, in fact, the subject of his admissions, were seized from a table inside his home at the time of his arrest* and also from a wallet and address book that were found on his person at the time of his arrest." Government's brief at 18. (Emphasis supplied.)

Therefore, at least some of the admissions made by Basurto related to or were prompted by the documents seized from the kitchen table, which we have determined were erroneously admitted by the trial court. Since the government has not proven beyond a reasonable doubt that these statements did not contribute to Basurto's conviction, under Chapman v. California, *supra*, the unconstitutional seizure of the papers on the kitchen table cannot be said to have resulted in harmless error. Therefore, the illegal search of Basurto's house furnishes an independent ground for reversing his conviction.

## Alleged Variance Between Indictment and Proof

 Appellants allege that there is a fatal variance between the indictment and the proof. They contend that while the indictment charged them with one conspiracy, evidence was offered at trial to prove the existence of two conspiracies—one before May 1, 1971, and another on and after that date.

We reject appellants' contention on the authority of United States v. Noah, 475 F.2d 688 (9th Cir. 1973). In that case, the indictment contained two counts, charging conspiracies prior to and commencing on May 1, 1971. We ordered that one of the counts be dismissed, on the theory that the mere fact that an agreement to commit unlawful acts might violate different statutes "does not create separate conspiracies out of one conspiracy." 475 F.2d at 693. It was therefore proper for the indictment in the instant case to have alleged only one conspiracy.

## Effect of Repeal of 21 U.S.C. § 176a Upon Prosecution Commenced After the Repeal

Appellants contend that the indictment should have been dismissed on the ground that 21 U.S.C. § 176a was repealed effective May 1, 1971, prior to the bringing of charges against them.

 As has been discussed above, § 176a was repealed by the Comprehensive Drug Abuse Prevention and Control Act of 1970, *supra*, which became effective on May 1, 1971. Section 1103(a) of the Act, cited in a note following 21 U.S.C. § 171, provides:

"Prosecutions for any violation of law occurring prior to the effective date of

[the Act] shall not be affected by the repeals or amendments made by [it] . . . or abated by reason thereof."

Bradley v. United States, 410 U.S. 605, 93 S.Ct. 1151, 35 L.Ed.2d 528 (1973), requires the rejection of appellants' contention. In that case, the Supreme Court specifically interpreted § 1103(a) to allow for narcotics offenses committed prior to May 1, 1971, to be prosecuted and sentenced according to the laws in effect at the time the offense was committed. It was therefore proper to charge appellants under § 176a for offenses committed before May 1, 1971.

### Search of Waggoner's Wallet 30 Minutes After his Arrest

Appellant Waggoner was arrested by Agents Sepulveda and Waddill. At the time of his arrest, Agent Sepulveda searched him, seized a wallet from his pocket, and placed it on the dashboard of the agent's automobile. The wallet contained incriminating writings and documents. Agent Sepulveda did not open the wallet until he arrived at the Customs Office approximately 30 minutes later, at which time Agent Waddill removed the papers from the wallet and questioned Waggoner about them. When confronted with the documents, Waggoner said that he knew "he was in trouble" and made admissions which the government introduced at trial.

■ Waggoner admits that the search of his person was lawful under Chimel v. California, *supra*, but contends that the warrantless search of his wallet 30 minutes after his arrest was unlawful. In *Chimel*, the Supreme Court stated that "it is entirely reasonable for the arresting officer to search for and [to] seize any evidence on the arrestee's person in order to prevent its concealment or destruction. . . ." 395 U.S. at 763. Waggoner argues that the search 30 minutes after his arrest does not come within *Chimel*, since the wallet at that point was "under the dominion and control" of the Customs agents.

That issue was decided to the contrary in United States v. Edwards, 415 U.S. 800, 94 S.Ct. 1234, 39 L.Ed.2d 771, 42 U.S.L.W. 4463 (1974). There the Court held "that once a defendant is lawfully arrested and in custody, the effects in his possession at the place of detention that were subject to search at the time and place of his arrest may lawfully be searched and seized without a warrant even though a substantial period of time has elapsed between the arrest . . . and the taking of property for use as evidence. . . ." 415 U.S. at 807 [94 S.Ct. at 1239]. An argument similar to that advanced by Waggoner was rejected by this court in United States v. Mehciz, 437 F.2d 145 (9th Cir. 1971), cert. denied, 402 U.S. 974, 91 S.Ct. 1663, 29 L.Ed.2d 139 (1971).

### Sufficiency of the Evidence Against Travers

■ Appellant Travers contends that the evidence against him was insufficient to support his conviction. The evidence against Travers consisted of the following:

(1) Barron's testimony that Waggoner told Barron that Travers was a "dealer." The conversation took place at Travers' home when Travers was not home. The prejudicial effect of this hearsay testimony was great. The prosecuting attorney stressed this statement in his closing argument, contending that "dealer" meant "dealer in marijuana":

> "The evidence shows that Mr. Travers was a marijuana dealer, a Canadian connection, if you will, who was a dealer in marijuana, who was present at the meetings of the conspiracy and who agreed with William Barron that the conspiracy was being run very loosely."

(2) Barron's testimony that in a conversation with Travers in an automobile, Travers told him that he "thought the thing was loose."

(3) Four government exhibits which tended to establish Travers' acquaint-

ance with some of the conspirators. Three of these exhibits were seized from a wallet located in a car at the scene of Travers' arrest. Also found in the wallet was a driver's license containing Travers' name but not his picture. The wallet and driver's license were not produced at trial, although a search warrant had been issued for them, and the district court allowed testimony concerning the driver's license over objection. None of the exhibits introduced contained Travers' name.

(4) The testimony of a government witness, Bernard Volz, that he saw Travers with Waggoner in Lake Tahoe in September 1971.

(5) The testimony of government witness Aubrey Taylor that he was introduced to Travers by Waggoner at Waggoner's house but that Travers was "just sitting there."

 Travers was charged with the crime of conspiracy. Conspiracy is "a partnership in criminal purposes. The gist of the crime is the confederation or combination of minds." Marino v. United States, 91 F.2d 691, 694 (9th Cir. 1937). The government has the obligation to establish not only the opportunity but also the actual meeting of minds. Mere association and activity with a conspirator does not meet the test. Ong Way Jong v. United States, 245 F.2d 392 (9th Cir. 1957). Mere knowledge of the existence of a conspiracy is not sufficient to sustain a conviction. Roberts v. United States, 416 F.2d 1216 (5th Cir. 1969).

After carefully reviewing the record, we conclude that the evidence against Travers was insufficient to support his conviction.

The judgments of convictions are reversed.

HUFSTEDLER, Circuit Judge (concurring specially):

I concur in the result reached by the majority, but I find unsatisfactory the constitutional theory it advances to support its conclusion that the prosecutor had a duty to inform the grand jury of Barron's perjured testimony. Unlike the prosecutors in Napue v. Illinois (1959), 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217, and Alcorta v. Texas (1957), 355 U.S. 28, 78 S.Ct. 103, 2 L. Ed.2d 9, who "did nothing to correct the witness' false testimony" (360 U.S. at 265), the prosecutor in the case at bench notified both defense counsel and the trial court upon learning of the perjured testimony. I do not believe that the prosecutor's failure additionally to inform the grand jury was such a breach of his constitutional duty of good faith as to constitute a violation of defendants' due process rights.

Although the majority's constitutional analysis is not persuasive, it would be an appropriate exercise of our power to supervise the administration of criminal justice in the federal courts to impose upon federal prosecutors the duty to notify the grand jury described by the majority. (*See generally* McNabb v. United States (1943), 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819. An important function of our supervisory power is to guarantee that federal prosecutors act with due regard for the integrity of the administration of justice. In Mesarosh v. United States (1956), 352 U.S. 1, 77 S.Ct. 1, 1 L.Ed.2d 1, a case involving possible perjury by a witness at trial, the Supreme Court observed: "This is a federal criminal case, and this Court has supervisory jurisdiction over the proceedings of the federal courts. If it has any duty to perform in this regard, it is to see that the waters of justice are not polluted." (352 U.S. at 14 (footnote omitted); *see* United States v. Poole (7th Cir. 1967), 379 F.2d 645 (supervisory power used to reverse conviction because government suppressed evidence).) Our supervisory power is not limited to control of conduct that occurs at trial; we have specifically found it to extend to matters involving the grand jury. (Bursey v. United States (9th Cir. 1972), 466 F.2d 1059, 1082.)

The grand jury serves important public interests not only through its exami-

nation into the commission of crimes but also by its ability "to stand between the prosecutor and the accused, and to determine whether the charge was founded on credible testimony or was dictated by malice or personal ill will." (Hale v. Henkel (1906), 201 U.S. 43, 59, 26 S.Ct. 370, 373, 50 L.Ed. 652; Hoffman v. United States (1951), 341 U.S. 479, 485, 71 S.Ct. 814, 95 L.Ed. 1118; Bursey v. United States, *supra* at 1089–1090. *See also* Branzburg v. Hayes (1972), 408 U. S. 665, 686–687, 700, 92 S.Ct. 2646, 33 L.Ed.2d 626.) By failing to inform the grand jury of Barron's perjured testimony and thus precluding the opportunity to reconsider the indictment in light of the corrected version of the defendants' activities, the prosecutor effectively frustrated this vital function. A supervisory rule requiring a prosecutor who learns before trial that an indictment is based in some material way on perjured testimony to seek dismissal of the tainted indictment would safeguard the grand jury's role as mediator between prosecutor and potential defendant. Such a supervisory rule would also help insure that the prosecutor fulfills his responsibility to deal with the grand jury in a way that promotes the wise exercise of its investigatory and indictment powers. (Hoffman v. United States, *supra* at 485.) Even though breach of that prosecutorial duty may not constitute a violation of defendant's constitutional rights, the prosecutor is nevertheless responsible to the court for conduct that is potentially detrimental to the integrity of the judicial system. (*See* Berger v. United States (1935), 295 U.S. 78, 88–89, 55 S.Ct. 629, 79 L. Ed. 1314; Newman v. United States (1967), 127 U.S.App.D.C. 263, 382 F.2d 479, 481.) It is thus well within our supervisory jurisdiction to require that the United States Attorney shall move for dismissal of indictments based on perjured testimony.*

---

* Because this duty is owed to the court and grand jury and not to the defendant, the strategic decision of the defendant not to

Whether measured by the supervisory rule I have suggested or the constitutional duty imposed by the majority, the response of the prosecutor in the case at bench to the discovery that a witness had perjured himself before the grand jury was inadequate. I therefore agree with the result reached by the majority in the first section of its opinion. I concur in the majority's treatment of the other issues raised by these appeals.

challenge the indictment cannot affect the prosecutor's obligation to seek dismissal of the indictment.