**UNITED STATES of America,**
**Plaintiff,**

v.

**Julius James NASH, Defendant.**

**No. 74-CR-65.**

United States District Court,
E. D. Wisconsin,
Milwaukee Division.

June 4, 1975.

---

Charles Clevert, Asst. U. S. Atty., Milwaukee, Wis., for plaintiff.

Robert J. Lerner, Lerner & Adelman, Milwaukee, Wis., for defendant.

## DECISION AND ORDER

WARREN, District Judge.

On April 11, 1974 defendant Julius James Nash was charged by a grand jury with two counts of knowing receipt, possession and transportation in commerce of a firearm by a convicted felon, in violation of Title 18 Appendix, § 1202 (a)(1), United States Code of Laws. The subject weapons are two revolvers which were seized from defendant's residence by a City of Milwaukee police officer on the morning of October 20, 1973. Their suppression, as well as the suppression of a third revolver and three rifles also seized at that time, constitutes the subject of this Court's disposition herein.

Defendant's motion for suppression of firearms was reinstated on April 10, 1975, upon transfer of the instant action to this Court. The parties having failed to reach any accord on the relevant facts, an evidentiary hearing was conducted on April 16, 1975, followed by the submission of briefs by defendant and the Government supportive of their respective positions.

The evidentiary hearing conducted herein disclosed no factual dispute. Patrolman Michael Carlson of the Milwaukee Police Department, the sole witness at such hearing, testified that at approximately 4:15 A.M. on the morning of October 20, 1973, he responded to a dispatcher's request for investigation of a shooting at 2939 North 24th Street. Officer Carlson was admitted to the residence through the front door by Patrolman Frederick Tice, a member of the ambulance squad, who was already on the scene. Carlson stated that, upon entrance, he observed the defendant Julius Nash lying on the floor between the kitchen and the living room with a gunshot wound to his left leg. Carlson inquired as to what had occurred and was informed by the defendant that he had shot himself while cleaning his gun and that the gun could be located in the bedroom. Officer Carlson then proceeded to the bedroom where he observed the gun in question lying on the floor adjacent to the bed and observed as well an open manila envelope which contained a "crushed greenish brown weed" that Carlson suspected to be marijuana. Having recovered both the weapon and the envelope, Carlson returned to the living room.

From his position in the living room, as he had also upon his entrance to the residence, Officer Carlson observed several marijuana roaches in the ash trays. He further observed other manila envelopes of the same type discovered in the bedroom as well as an open cannister containing a "crushed greenish brown weed" on top of the bar. Moreover, on the wall behind the bar Carlson observed a rack on which were hung three rifles. Officer Carlson proceeded to the bar for the purpose of collecting the suspected marijuana. In so doing he stepped behind the bar, whereupon he observed one revolver lying on the floor and two additional revolvers lying on a shelf behind the bar. Officer Carlson testified that his purpose in proceeding behind the bar was to recover the suspected marijuana and marijuana paraphernalia that was on top of the bar but that it would not have been necessary for him to go behind the bar to recover such items. He further stated that he could not have observed the three revolvers from a position in front of the bar.

Subsequent to his confiscation of the suspected marijuana and defendant's conveyance from the residence, Officer Carlson, together with his partner Patrolman Mark Koch, removed all discovered weapons from the premises. Officer Carlson stated that the latter action was prompted by the inability of himself and his partner to lock the front door and secure the premises as well as their judgment that the weapons should be removed for safekeeping. Carlson further testified that he acted in conformity with police department rules and regulations which required him to secure the premises in the best fashion available and to insure the safety of any valuables. In addition, as Carlson was aware at the time and as counsel stipulated during the course of the hearing, defendant's residence was situated in an area subject to a high rate of crime. Carlson then gave to defendant's mother, who did not intend to remain at the residence but who intended to post two guard dogs, a list of the items taken. He did not, however, seize other items of value which were situated in the residence. It was also undisputed that no effort had ever been made to obtain a search warrant; that defendant was never arrested for or charged with any crime relative to the suspected marijuana; that possession of a firearm contravenes no law of the State of Wisconsin or ordinance of the City of Milwaukee, and that Officer

Carlson possessed no knowledge at the time of the incidents heretofore described that Julius James Nash was a convicted felon.

■ One of the most fundamental principles of the law of search and seizure is that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specially established and well-delineated exceptions." Katz v. United States, 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed. 2d 576 (1967); Schneckloth v. Bustamonte, 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *accord,* United States v. Cooks, 493 F.2d 668, 670 (7th Cir., 1974). These exceptions have been "jealously and carefully drawn," Jones v. United States, 357 U.S. 493, 499, 78 S.Ct. 1253, 2 L.Ed.2d 1514 (1958), and will not lie except upon "a showing by those who seek exemption from the constitutional mandate that the exigencies of the situation made that course imperative." McDonald v. United States, 335 U.S. 451, 456, 69 S.Ct. 191, 193, 93 L.Ed. 153 (1948). *See also,* Coolidge v. New Hampshire, 403 U.S. 443, 454–455, 91 S.Ct. 2022, 29 L.Ed.2d 564. Thus, the burden is upon the Government to demonstrate by a preponderance of the evidence that the weapons under discussion herein were properly seized without the issuance of a search warrant. Lego v. Twomey, 404 U.S. 477, 488, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972); United States v. Cooks, *supra*; United States v. Gamble, 473 F.2d 1274, 1276 (7th Cir., 1973). It seeks to do so by invoking the doctrine of plain view and the reasonableness of Patrolman Carlson's seizures under the circumstances.

In view of defendant's challenge to the seizability of the firearms under the Fourth Amendment, logic dictates that this Court decide that issue prior to making any determination of the applicability of the plain view doctrine. Defendant argues that inasmuch as there exists no evidence of record to establish that the weapons constituted the fruits of a crime, contraband, the instrumentalities of a crime or evidence of the commission of a particular crime by the defendant, they were not subject to seizure. Having examined the law and the particular circumstances of the instant case, the Court does not agree.

The Fourth Amendment provides to the individual a right to be secure against only *unreasonable* searches and seizures. It would thus appear that resolution of the issue whether an object is in fact seizable under the Fourth Amendment turns upon the question of whether it was reasonable to have seized it. Moreover, any determination of reasonableness necessarily "depends upon the facts and circumstances—the total atmosphere of the case." United States v. Rabinowitz, 339 U.S. 56, 66, 70 S.Ct. 430, 435, 94 L.Ed. 653 (1950); *accord,* United States v. Basurto, 497 F.2d 781, 788 (9th Cir., 1974). As assessed by another district court:

" . . . The reasonableness of the seizure is to be judged by the objective standard of whether the facts available to the officers at the moment of the seizure warranted a man of reasonable caution in the belief that the action taken was appropriate . . . ." United States ex rel. McDougald v. Hassfuder, 372 F.Supp. 395, 397 (M.D.Fla., 1974).

■ During the course of the evidentiary hearing, Officer Carlson testified that his seizure of the firearms was prompted by the inability of police to secure the premises, the anticipated vacancy of the residence, the fact that the residence was located in an area subject to a high rate of crime, and police department regulations requiring that valuables be in some measure insured against theft, all of which are supportive of a finding of reasonableness. In addition to the stated concern that the weapons be protected from thieves, the Court infers from such testimony a concern, much like that which rendered the revolver a seizable item in Cady v. Dom-

browski, 413 U.S. 433, 447–448, 93 S.Ct. 2553, 37 L.Ed.2d 706 (1973), that the weapons, at least one of which officers had reason to believe was loaded and which were strewn about the apartment, might fall prey to persons who would misuse them and create a public danger. Nor does the Court find that the intention of defendant's mother to leave two dogs on the premises and the failure of police officers to remove other items of value from the apartment detract from the reasonableness of the removal of the firearms. As to the latter factor, no testimony was elicited from Officer Carlson regarding the nature of the valuables which the officers allowed to remain, and this Court is consequently without any means to measure the reasonableness of the seizure of the firearms as compared to the remaining items of value. The Court therefore finds, under the totality of the circumstances, that the seizure of the seven firearms was reasonable and that such items could in fact be subject to seizure under the Fourth Amendment. Having made such determination, it remains to consider whether the warrantless "search" which revealed the rifles and· the revolvers behind the bar was consonant with the requirements of the Fourth Amendment.

■ As heretofore noted, Officer Carlson testified that the three rifles in ' question were immediately visible to him, hanging on the wall behind the bar, upon his entry into defendant's residence. Similarly visible to Carlson on his entry through the front door of the residence into the living room were the marijuana roaches in the ash trays and the envelopes and open cannister containing the suspected contraband situated atop the bar. There is thus no question but that the rifles and the contraband at least were in plain view. As stated by the Supreme Court in *Coolidge,* however, "plain view *alone* is never enough to justify the warrantless seizure of evidence." *Id.* at 468, 91 S.Ct. at 2039. Of equal importance are the criteria that the initial intrusion which brings the

police within plain view must be legally justified and the discovery of the objects inadvertent:

"What the 'plain view' cases have in common is that the police officer in each of them had a prior justification for an intrustion in the course of which he came inadvertently across a piece of evidence incriminating the accused . . . ." *Coolidge, supra,* 403 U.S. at 466, 91 S.Ct. at 2038.

Thus, in each situation, the initial intrusion must first be justified "by a warrant or by an exception such as 'hot pursuit' or search incident to a lawful arrest, or by an extraneous valid reason for the officer's presence." *Id.* at 467, 91 S.Ct. at 2039.

■ Although not adduced during the examination of Officer Carlson at the evidentiary hearing, defendant concedes in his brief that he consented to the entry of his residence by police officers. The matter of legal justification for the initial entry of Officers Carlson and Koch into the residence by way of the living room is therefore not in issue, defendant's acknowledged consent having supplied the "extraneous valid reason" for the officers' presence. In any event, having responded to a request for investigation of a shooting, it is the opinion of this Court that an extraneous valid reason for police presence would have been likewise supplied by the compelling need to assist the victim of the shooting and/or apprehend the perpetrator.

Nor is there any question as to the inadvertence of Officer Carlson's discovery of the rifles or the contraband. The evidentiary hearing disclosed no advance knowledge of the existence of any of the items seized by police nor any prior intent to seize such items which would favor the procurement of a warrant. The police officers simply entered the living room in pursuit of a valid objective, from which position the items were readily discernable.

■ These same issues, however, are not so easily resolved with respect to the

three revolvers discovered by Officer Carlson behind the bar. Defendant questions in his brief the legal justification for Officer Carlson's need to step behind the bar when, as is disclosed by his own testimony, there was no need to do so to retrieve the contraband which was in plain view on top of the bar and which Carlson could have retrieved from a position in front of the bar.

This Court is not inclined to require distinct legal justification for Carlson's position at or in front of the bar as opposed to his position in stepping behind the bar, especially where, in retrospect, the latter movement does not appear to have been unreasonable. It is undisputed that the suspected contraband was in plain view on top of the bar and that its seizure from the bar in some fashion was clearly justified under the law. Officer Carlson, a very candid witness, testified that his sole reason for stepping behind the bar—in essence simply a piece of furniture—was to seize those items on top of the bar. It does not appear that he was in search of additional evidence nor does it appear that he contrived to gain a vantage point from which he might view other incriminating evidence. Thus, the situation is clearly distinguished from that proscribed by *Coolidge* wherein the plain view doctrine is "used to extend a general exploratory search from one object to another until something incriminating at last emerges." *Id.* at 466, 91 S.Ct. at 2038. Cf. United States v. Erwin, 507 F.2d 937 (5th Cir., 1975). Officer Carlson was legally entitled to approach the bar and seize the contraband situated thereon by any reasonable method. That the reasonable method chosen was not the least intrusive does not warrant suppression.

In view of that determination and the concomitant finding of this Court that Officer Carlson was legally entitled to be in the position behind the bar from which he observed the revolvers, and inasmuch as there exists no question that his discovery of the weapons was inadvertent, it follows that the doctrine of plain view also justifies seizure of the three revolvers discovered behind the bar.

Now, therefore, it is ordered that defendant's motion to suppress be and hereby is denied.