UNITED STATES of America,
Plaintiff,

v.

Jerome Daniel FOOTE and Brandon
Smith, Defendants.

No. CRIM.A. 00–20091–KHV.

United States District Court,
D. Kansas.

March 6, 2002.

Carl E. Cornwell, Cornwell, Cameron, Erickson & Travis, Olathe, KS, for Defendants.

## MEMORANDUM AND ORDER

VRATIL, District Judge.

This matter is before the Court on Jerome Daniel Foote's Motion To Dismiss (Doc. # 42) filed January 14, 2002. On February 20, 2002, the Court held a hearing on defendant's motion. For reasons set forth below, defendant's motion is overruled.

### Factual Background

On December 1, 1997, FBI Special Agent Albert Pisterzi received a mailing from "Replicas," which advertised high quality reproductions of sunglasses, watches, handbags and apparel. On December 6, 1997, Pisterzi went to Replicas and observed that Foote was selling the advertised merchandise from his residence in Lenexa, Kansas. Pisterzi observed that original garment tags had been removed and replaced by various trademark tags. He also observed that handbags purportedly manufactured in Europe displayed "Made in China" tags.

On February 6, 1998, Richard Smith, a consultant with The Guidry Group in Dallas, Texas, went to Replicas, where Foote greeted him.[1] Smith inspected the merchandise which Foote offered for sale, including watches, jewelry, handbags, sunglasses and clothing apparel. Based on his training and experience, Smith concluded that the items were counterfeit. Smith based his conclusion on the poor quality of workmanship and material, the removal of original neck tags and replacement with counterfeit trademark tags which were not properly sewn into the shirt, a low stitch count, missing tags, absence of labels or warranty cards that would ordinarily accompany trademark merchandise, and the

---

[1]. Brandon Smith is a co-defendant, but he has not filed a motion to dismiss and he is not otherwise implicated in the facts surrounding Foote's motion to dismiss. Accordingly, all references to "Smith" in this Memorandum And Order are to Richard Smith, the government's expert consultant.

low price of the merchandise offered for sale. During the visit, Foote told Smith that the items were "copies" and the "best damn copies in the world that money could buy."

In August or September 1998, Foote relocated Replicas from his residence to a strip mall at 7922 Quivira in Lenexa, Kansas. On November 22, 1998, Smith and FBI Special Agents Stanley Wright and Melissa Osborne went to Replicas. They observed that the merchandise was similar to the merchandise which Foote had previously offered at his residence. Smith determined that the items contained counterfeit trademarks. Smith also knew that the companies which utilized the trademarks had registered the trademarks with the U.S. Patent and Trademark Office. On their visit, the agents purchased $466.00 in merchandise.[2] After Smith and Agent Wright left the store, Agent Osborne remained in the store and overheard employees say that they were suspicious of the manner in which Smith and Agent Wright had purchased the items and that they thought the individuals might be investigating activity at Replicas. Smith examined the 23 items purchased and determined that they were counterfeit.

On December 2, 1998, the Honorable Gerald L. Rushfelt, United States Magistrate Judge, issued a search warrant for "counterfeit merchandise" located at Replicas, as well as "business records, computer and computer hardware, books, business documents, inventory records of sales, inventory records of orders, records of promotional material or advertisements, and records of Federal Express and United Parcel Service (UPS) receipts and ship-

ments relating to the purchase and sale of counterfeit merchandise."

On Monday, December 7, 1998 at 8:30 a.m., agents executed the search warrant at Replicas. To aid in the identification of counterfeit trademark goods, Smith and Michael McKenna, another consultant from The Guidry Group, accompanied the agents. Carolyn Donahue, Administrative Assistant to the President and Director of the Anti Counterfeit Program at Dooney & Bourke, also assisted agents to aid in identifying counterfeit trademark goods during the execution of the warrant.

At 11:00 a.m., while agents were still executing the warrant, Foote arrived at Replicas and agreed to speak with FBI Agents Wright and Frank Carey. Foote admitted that the items offered for sale at Replicas were "fakes or replicas." Foote told agents that he had suspected that the FBI was investigating him when the two men had made the purchase on November 22. Foote stated that on November 23, based on his suspicions, he started to remove all of the merchandise from Replicas until the "pressure was off." Foote stated that on November 30, 1998, however, he started moving the merchandise back into the business. Foote also stated that on December 1, he had additional counterfeit merchandise unloaded at Replicas from a Penske rental truck and two white cargo trailers parked in the rear of the store. The agents asked Foote for permission to search the two white cargo trailers, which he declined.

After agents completed their interview with Foote, Agent Wright prepared an

---

**2.** The merchandise purchased included 23 items: a man's Rolex, a Mont Blanc pen, a DKNY purse, a Fendi purse, a Polo Ralph Lauren purse, a Coach handbag, a Dooney & Bourke handbag, a Dooney & Bourke cigarette purse, a Louie Vuitton wallet, a Nike t-shirt, a Tommy Hilfiger sweatshirt, a pair of Tommy Hilfiger jeans, a FUBU sweatshirt, a Nike baseball cap, a Nautica sweatshirt, a Nike pullover shirt, a Nike hooded sweatshirt, an Adidas sweatshirt, a Guess sweatshirt, a Polo sweatshirt, a Fila t-shirt, a Mickey sweatshirt and a Tommy Girl sweatshirt.

affidavit and application for a search warrant to search the two white cargo trailers. Magistrate Judge Rushfelt signed the requested warrant and agents executed the search later that afternoon.

Agents seized a total of approximately 5200 items (approximately 3,500 items from inside Replicas and approximately 1,700 items from the two cargo trailers) which they believed were counterfeit.

On June 21, 2000, a grand jury returned an indictment which charged Foote with three counts of trafficking in goods bearing counterfeit marks in violation of 18 U.S.C. § 2320. See Sealed Indictment (Doc. # 1). On May 24, 2001, a grand jury returned a superseding indictment which charged Foote and Brandon Smith with conspiracy to traffic in goods bearing counterfeit marks, and also charged Foote with one count of money laundering in violation of 18 U.S.C. § 1956, one count of engaging in a monetary transaction in property derived from an unlawful activity in violation of 18 U.S.C. § 1957, and three counts of trafficking in goods bearing counterfeit marks. See Sealed Superseding Indictment (Doc. # 3). On December 13, 2001, a grand jury returned a second superseding indictment which charged Foote and Brandon Smith with conspiracy to traffic in goods bearing counterfeit marks, and also charged Foote with six counts of money laundering, one count of engaging in a monetary transaction in property derived from an unlawful activity, and 37 counts of trafficking in goods bearing counterfeit marks. See Second Superseding Indictment (Doc. # 34).

### Analysis

Relying on United States v. Basurto, 497 F.2d 781 (9th Cir.1974), Foote argues that the indictment should be dismissed because it is based on perjured testimony. In Basurto, the Ninth Circuit held that "the Due Process Clause of the Fifth Amendment is violated when a defendant has to stand trial on an indictment which the government knows is based partially on perjured testimony, when the perjured testimony is material, and when jeopardy has not attached." Id. at 785.

Initially, the Court notes that the Tenth Circuit has not adopted Basurto and in dicta has noted Basurto's questioned validity and limited reach. See Talamante v. Romero, 620 F.2d 784, 790 n. 7 & 790–91 (10th Cir.1980); see also Moreland v. Madrid, 232 F.3d 902, 2000 WL 1594219, at *2 (10th Cir.2000) (assuming Basurto is law of Tenth Circuit); Doran v. Stratton, 930 F.2d 33, 1991 WL 35249, at *2 (10th Cir. 1991) (same). For purposes of defendant's motion, however, the Court assumes that Basurto applies in the Tenth Circuit.

 To obtain dismissal of an indictment based on perjury before the grand jury, defendant must show that (1) a witness intentionally testified falsely before the grand jury, see United States v. Hargus, 128 F.3d 1358, 1365 (10th Cir.1997) (perjury requires willful intent to provide false testimony, not as result of confusion, mistake or faulty memory), cert. denied, 523 U.S. 1079, 118 S.Ct. 1526, 140 L.Ed.2d 677 (1998); cf. Basurto, 497 F.2d at 784 (witness admitted perjury before grand jury) and (2) such testimony was material to the grand jury's decision to return an indictment, see Talamante, 620 F.2d at 790.[3]

### I. Testimony Of FBI Agent Stanley Wright

 On May 23, 2001, Agent Wright testified to the grand jury that manufac-

---

**3.** Basurto actually requires that the government disclose to opposing counsel and the Court any discovery of perjury committed before the grand jury. See Talamante, 620 F.2d at 790. In this case, the Court need not explore the prosecution's knowledge because it finds that Foote has not shown perjury.

turers had verified that all 5300 items seized from Replicas were counterfeit. Foote claims that this testimony was perjurious, and at the hearing on February 20, 2002, Agent Wright conceded that his statement technically was not true. Agent Wright testified that he submitted "samples" of the items to their purported manufacturers, rather than submitting every single item, and that a few of the items were determined not to be counterfeit for purposes of 18 U.S.C. § 2320 because the manufacturer had not registered its trademark for the particular item sold.[4]

■ Although Agent Wright testified falsely to the grand jury about the verification of all items seized, no evidence suggests that he intentionally did so. False testimony given as a result of confusion, mistake or faulty memory does not justify dismissal of an indictment. See *United States v. Moore*, 184 F.3d 790, 794 (8th Cir.1999); *Hargus*, 128 F.3d at 1365. Moreover, Foote has not shown that Wright's false statement was material to the grand jury's decision to return an indictment. Foote does not deny that for the specific goods identified in the three indictments, Agent Wright verified that each of them was counterfeit. Also, from the evidence presented at the hearing on February 20, 2002, the grand jury did not even know that 5300 items had been seized on December 7, 1998. Indeed, the grand jury apparently knew only that "over fifty" items were seized and found to be counterfeit. See Government Exhibit 2: Wright Testimony of May 23, 2001 at 18. Agent Wright's testimony was also immaterial because an earlier grand jury had indicted Foote without the testimony of Agent Wright on this particular issue. Agent Wright specifically testified to the earlier grand jury that agents employed a sam-

pling technique. See Government Exhibit 1: Wright Testimony of June 21, 2000 at 9.

■ Foote also claims that Agent Wright committed perjury by testifying to the grand jury that on December 7, 1998, Smith examined all of the 5300 items found at Replicas and determined that they were counterfeit. Foote argues that this testimony was false because it would have been physically impossible for Smith to stand over and inspect the work of 30 agents who boxed the 5300 items. Agent Wright admits that although Smith was the primary individual who oversaw the seizure of merchandise, he was assisted by McKenna (another consultant) and Donahue (a representative from Dooney & Bourke). Based on the fact that Smith was primarily responsible for the task of overseeing the seizure, the Court finds that Agent Wright did not intentionally mislead the grand jury and that any failure to mention the roles of McKenna and Donahue was immaterial. Foote also contends that Wright's statement was false because Smith could not identify the goods as counterfeit based solely on a visual inspection. Agent Wright agrees that the goods could not be identified as counterfeit for purposes of 18 U.S.C. § 2320 until the various manufacturers had inspected the merchandise and advised agents that they held a trademark registered for the particular item offered for sale. He argues, however, that based on a visual inspection, agents had a reasonable belief that the merchandise was counterfeit. In retrospect, Agent Wright probably should have qualified his statement by saying that Smith *opined* that the goods *appeared to be* counterfeit, rather than saying that Smith *verified* that the goods were counterfeit. In context, however, the semantic distinction is so minor that Agent Wright clearly did not intentionally mis-

---

4. For example, agents seized Calvin Klein lighters, but as of December 7, 1998, Calvin Klein had not registered its trademarks for lighters.

lead the grand jury and any misstatement was immaterial.[5]

Finally, Foote argues that Agent Wright committed perjury by testifying to the grand jury that Foote told him during an interview on December 7, 1998 that he knew that the merchandise he was selling was counterfeit. See Wright Testimony of May 23, 2001 at 19 ("Mr. Foote advised us that he knew and has known that the merchandise that he was selling was counterfeit and he was aware of that."). Foote argues that this testimony is false because he referred to the items as "fakes" or "replicas," not "counterfeit."[6] Agent Wright maintains that Foote used the term "counterfeit" or at least responded affirmatively when agents used the term. The Court finds that Agent Wright is a credible witness, and therefore that his grand jury testimony was truthful. Even if his grand jury testimony was false, Foote has not shown that Agent Wright intentionally misled the grand jury or that the distinction between a "fake" or "replica," as opposed to a "counterfeit" good, was material to the grand jury's decision to return an indictment. See Webster's Third New Int'l Dictionary—Unabridged (1993) at 519 (definition of counterfeit includes references to both fakes and replicas).

## II. Testimony Of IRS Agent Henry Herron

Foote claims that IRS Agent Henry Herron committed perjury when he testified that other than income from Replicas, Foote had no legitimate source of income. See Government Exhibit 3: Herron Testimony of May 23, 2001 at 9–11. Foote argues that this testimony is false because Herron knew that Foote was selling store fixtures and that he had storage units full of fixtures for resale, that Foote had some non-counterfeit merchandise at his store (such as generic jewelry and watches), and that Foote sold legitimate merchandise at the Santa Cali Gon Days festival on September 6, 2000. The Court, however, finds that Agent Herron's grand jury testimony was truthful. First, Foote has not shown that he reported any of the income from these activities on his tax returns. Agent Herron testified that he was unable to verify that Foote was selling store fixtures and that the generic jewelry at Replicas was actually offered for sale by one of Foote's employees. Foote himself did not receive any income from the sale of generic jewelry. Finally, Foote has not shown that he sold "legitimate" merchandise at the Santa Cali Gon Days festival or that he reported any income from the sale of merchandise at that location. Foote's testimony on these matters is wholly incredible. The Court also finds that even if Agent Herron testified falsely before the grand jury, he did not intentionally do so and that any such misstatements were immaterial. The conspiracy alleged in the indictment spans from January 1995 through October 2000, but all of the substantive counts allege specific transactions

---

5. The grand jury was well aware that a visual examination by itself did not conclusively establish that the item was counterfeit. Agent Wright previously had explained to the grand jury that he sent the items specified in the indictment to various manufacturers who verified that the items were counterfeit, see Wright Testimony of May 23, 2001 at 14–17, and that part of the delay in prosecuting the case was the laborious process of obtaining verifications from the various manufacturers that each item was indeed counterfeit, see id. at 39–40.

6. At the hearing on February 20, 2002, the Court heard testimony from Foote on this and other issues. Having considered his testimony and observed his demeanor on the witness stand, the Court would be hard pressed to credit this claim or any other which requires a finding that defendant is a credible witness.

which occurred between October 6, 1997 and June 5, 2000. See Second Superseding Indictment (Doc. # 34). The presence or absence of legitimate income for Foote on one particular day in September of 2000 is immaterial to these charges.[7]

█ Foote also claims that Agent Herron committed perjury by testifying that (1) Foote executed a cash transaction of approximately $12,700 with Citizens National Bank, (2) Foote did not want to disclose his actual identity to tellers at various banks, (3) Foote avoided having an account with various banks to avoid a record of the transaction, (4) Gold Bank had cash transaction reports (CTRs) for one of the transactions, and (5) agents had no way to trace how money orders were spent. The second and fourth statements were simply misstatements. Agent Herron erroneously referred to Gold Bank when in fact, Citizens National Bank was the institution which had generated CTRs concerning Foote's financial transactions. In addition, Agent Herron responded affirmatively when a grand juror stated that "[h]e avoided having an account in order to avoid the record of the transactions, is that the idea?" Herron Testimony of May 23, 2001 at 25–26. The context of the question and answer clearly shows that Agent Herron was stating that Foote avoided depositing money into his account so that no record of the transaction would be generated. See id. at 25–26. Agent Herron specifically told the grand jury that Foote did have accounts at the various banks. See id. at 25. These two misstatements are not sufficient to justify dismissal of the indictment. See Moore, 184 F.3d at 794; Hargus, 128 F.3d at 1365. As to the other three alleged misstatements, Foote has not

shown that Herron's grand jury testimony was untruthful, that Herron intentionally made the misstatements or that the misstatements were material to the grand jury's decision to return an indictment. Accordingly, defendant's motion to dismiss is overruled.

**IT IS THEREFORE ORDERED** that defendant Foote's Motion To Dismiss (Doc. # 42) filed January 14, 2002 be and hereby is **OVERRULED.**

---

7. In any event, Agent Wright clarified for the grand jury that agents thought that Foote was continuing to sell counterfeit merchandise at flea markets and other types of places, but that in September of 2000, agents were unable to obtain another warrant or arrest Foote because he correctly guessed that agents were acting in an undercover capacity. See Wright Testimony of May 23, 2001 at 40, 44–45.