UNITED STATES of America, Appellee,

v.

Boyer Alfredo BRACY, Appellant.

UNITED STATES of America, Appellee,

v.

Sondra Denise MARTIN, Appellant.

UNITED STATES of America, Appellee,

v.

Brenda BRACY, Appellant.

Nos. 76–3416, 76–3289 and 76–3325.

United States Court of Appeals,
Ninth Circuit.

Dec. 23, 1977.

Rehearings and Rehearings In Banc
Denied Feb. 13 and 28, 1978.

Ron Minkin, (argued), Los Angeles, Cal., Edward F. Bell, (argued), Detroit, Mich., for appellants.

Stephen W. Peterson, Asst. U. S. Atty., (argued), on the brief, Terry J. Knoepp, U. S. Atty., San Diego, Cal., for appellee.

Before WRIGHT and KILKENNY, Circuit Judges, and GRANT, District Judge.*

KILKENNY, Circuit Judge:

Appellants, together with three others [Stephanie Maria Gurley, Juanita Louise Kendricks, and Jerry Word], were indicted, tried and convicted in a jury trial of: (1) conspiracy to illegally import a controlled substance [heroin and cocaine] in violation of Title 21 U.S.C. § 963; (2) illegal importation of a controlled substance [5.5 pounds of heroin] in violation of Title 21 U.S.C. §§ 952, 960 and 963; (3) illegal importation of a controlled substance with intent to distribute [heroin and cocaine] in violation of Title 21 U.S.C. §§ 841(a)(1) and 846; (4) knowingly and intentionally possessing with intention to distribute approximately 5.5 pounds of heroin, a controlled substance, in violation of Title 21 U.S.C. § 841(a)(1).

The indictment before us, which was returned on June 30, 1976, superseded a previous indictment which was returned on April 28th of the same year. James Howard Porter [Porter], who later testified for the government, was named in the June 30th indictment as an unindicted coconspirator. Boyer Alfredo Bracy [A. Bracy], Sondra Denise Martin [Martin], and Brenda Bracy [B. Bracy] appeal. We affirm.

## FACTUAL BACKGROUND

The incidents upon which the counts in the superseding indictment were grounded and upon which appellants were convicted are separately summarized to facilitate the treatment of the issue concerning the number of conspiracies. The jury found there was one overall conspiracy.

## FEBRUARY 17, 1975, ARREST (CANADA INCIDENT)

On February 16, 1975, an airport security guard, while checking luggage at the Detroit airport noticed a large amount of cash in one Canada's luggage. Canada was accompanied by appellant A. Bracy. The security guard informed a local Drug Enforcement Agency (DEA) agent who ran a routine check on A. Bracy. He found that A. Bracy had a long history of narcotics violations. He notified officials in San Diego, Canada's destination, to alert them of this information. San Diego authorities established surveillance on Canada when she arrived in their city. She was met at the airport by Turner, a coconspirator, and later the two of them walked to a waiting car being driven by one Welsh. The trio rented a room at a local motel and engaged in a variety of activities around San Diego. Phone records from the rented room revealed that its occupants had placed a long distance call to a Detroit number assigned to the wife of a known lieutenant in a narcotics ring headed by Juanita Kendricks [Kendricks], a codefendant, and her husband, Richard, A. Bracy's parents. The following day, the 17th, Turner and Welsh went to Tijuana, Mexico, and they returned that afternoon. Another series of events followed where one or more of the threesome would leave the motel room. All

---

* The Honorable Robert A. Grant, Senior District Judge, United States District Court for the Northern District of Indiana, sitting by designation.

three, Canada, Turner, and Welsh checked out of the motel and headed north from San Diego. Their car was stopped by California Highway Patrol officers who asked permission to search the vehicle. Permission was granted, and the officers found various narcotics [heroin and cocaine] in the trunk.

### JANUARY, 1976, INCIDENT

Porter, an unindicted coconspirator, was employed by A. Bracy as a cleanup man at A. Bracy's suburban Detroit home. One Lomas worked as construction supervisor on the home. Both men moved to Los Angeles shortly before Christmas, 1975. Early in 1976 A. Bracy called Lomas and told him that he would be stopping in Los Angeles for a visit. A. Bracy arrived at Lomas' apartment with a girl friend, Susan Perry, and gave Lomas and Porter money, allegedly to buy undergarments to conceal narcotics. Lomas and Porter returned with the clothing. Then A. Bracy and Lomas drove to San Diego where they contacted Porter who had flown to San Diego and registered in a local motel [Royal Inn]. Lomas remained in the room while A. Bracy and Porter went to Tijuana. In Mexico, they met with Manuel Banaga (Manning). A. Bracy gave Manning a briefcase. Following the exchange, A. Bracy and Porter checked into a Tijuana Ramada Inn. A. Bracy instructed Porter to wait at the Ramada Inn until Manning arrived. Manning came to the room, and Porter gave him some car keys on A. Bracy's orders. After more waiting, Porter returned to the San Diego Royal Inn where he had met earlier with Lomas and A. Bracy. Lomas returned to Los Angeles. The next day Porter called Lomas and was advised that Lomas and appellant B. Bracy and her children would be traveling to San Diego. Lomas instructed Porter to wait for B. Bracy in Tijuana. Upon her arrival in Mexico, B. Bracy called Manning who returned to her room with the car keys he had been given by Porter the day before. B. Bracy left the hotel room with her children and returned with two bags of baby clothes in which were mixed several bags of heroin and cocaine. B. Bracy and Porter met and agreed that since they had a large number of drug packages she would transport the heroin, and he would cross with the cocaine. B. Bracy drove into the United States, and Porter flew into Los Angeles. Once in Los Angeles, Porter met Lomas and the two were later joined by B. Bracy. The three agreed that Porter should transport the narcotics to A. Bracy's home in Belleville, Michigan, a suburb of Detroit. Porter departed that night for Detroit, but on arrival he became suspicious of receiving payment for the smuggling so he left the heroin and flew back to Los Angeles keeping the cocaine as security. After Porter returned to Los Angeles, he was questioned by B. Bracy and Canada as to why he did not leave the cocaine as directed. Appellants B. Bracy and Martin tried to convince Porter to turn over the cocaine. Porter eventually returned the narcotics, but only after he was paid by A. Bracy.

### MARCH 17, 1976, INCIDENT

In mid-March, 1976, Porter was contacted by Martin and was told that A. Bracy was coming to Los Angeles. A. Bracy, Martin, and Jerry Word [Word] met Porter in his apartment. The meeting was organized to continue the narcotics smuggling effort. A. Bracy again gave Porter money to buy a girdle for smuggling purposes. Porter flew to San Diego and later checked into the Ramada Inn in Tijuana. Six hours later, A. Bracy, Martin, and Word arrived at the hotel restaurant. Porter passed his room number to Word in the hotel restroom. Porter also gave the number to A. Bracy in a similar fashion. Porter returned to his room and waited for one hour for A. Bracy, Martin and Word to arrive. A. Bracy brought two kilos of heroin with him. Porter was assigned to smuggle the heroin across the border in the girdle. Word and Porter left the hotel together, but they took separate cabs into the United States. Porter then flew back to Los Angeles, whereupon he returned to his apartment. About two hours later, A. Bracy arrived at Porter's apartment and took the heroin. He paid Porter $1,000.00 for his efforts.

## MARCH 20, 1976, INCIDENT

On March 20, 1976, A. Bracy again contacted Porter about going to Mexico. Porter was told to go to the Ramada Inn in Tijuana as before. Porter waited at the motel for six hours, and since no one arrived he departed for Los Angeles. That same day, Word went to the residence of one Debra Gillenwater [Gillenwater] and asked to borrow a car that was registered in her sister's name. Gillenwater consented. Word was accompanied by A. Bracy. Appellant Martin also registered in a nearby room. On the next morning Martin called Porter in Los Angeles and A. Bracy came on the line to inquire why Porter was not in Tijuana. Porter told A. Bracy that he got tired of waiting and had returned to Los Angeles. A. Bracy instructed Porter to come immediately to Tijuana. Several hours later Martin again called Porter and asked why he had not left for Mexico. Porter said he was on his way. These calls were verified by telephone logs at the Ramada Inn in Tijuana. Porter went to the airport but missed his flight and was forced to call A. Bracy with the news. A. Bracy told Porter to forget about coming to Tijuana. Additionally, on March 21, 1976, an automobile driven by Stephanie Gurley, a codefendant, was inspected at the San Ysidro port of entry and found to contain narcotics. The car was the same one borrowed by Word the day before. On or about March 21st, Maxine Chong [Chong] phoned B. Bracy and told her that someone named Stephanie was in trouble. At trial, Chong testified that the conversation might have been that Porter told her that Stephanie was in trouble.

There is substantial evidence that A. Bracy was the catalyst around whom the overall web of conspiracy was spun and that the command center of the group was in and around Detroit, Michigan.

## GRAND JURY INCIDENTS

Porter was served with a grand jury subpoena on April 6, 1976, and immediately phoned B. Bracy demanding $25,000.00 in exchange for his silence. B. Bracy, although professing innocence, referred him to Detroit. Another witness received an envelope from B. Bracy which he gave to Lomas. Inferentially, this envelope contained the money to pay Porter's legal fees.

On April 14, 1976, Porter appeared before the grand jury and told several lies. He testified that he had concluded working for A. Bracy in November of 1975, had only seen him once since then, and that A. Bracy had suggested and he had refused to engage in drug smuggling. Approximately ten days later Porter told DEA agents that he had perjured himself before the grand jury. DEA Agent Lunsford testified before the grand jury on April 28, 1976. He informed the panel members that Porter had been deeply involved in the smuggling operations. Porter did not reappear before the grand jury nor did Agent Lunsford specifically inform the members of the grand jury that Porter had perjured himself. Neither the court nor the opposing counsel was immediately informed of the perjury. As of May 26, 1976, appellants had received the investigating officer's reports containing the April 26, 1976, admissions by Porter. Additionally, on July 20th, appellants became aware of Porter's statement to Agent Lunsford as contained in an affidavit supporting the arrest of appellants. The grand jury testimony of Porter, Lunsford, and others was made available to appellants the day before the trial commenced.

## ISSUES ON APPEAL

I. Were appellants' due process rights violated when the government failed to immediately notify the court, counsel, and the grand jury that Porter had committed perjury before the grand jury?

II. Did the evidence establish, as a matter of law, that there were several conspiracies, rather than one?

III. Was the prosecutor's closing argument sufficiently prejudicial to require a reversal?

IV. Was there a failure on the part of the government to disclose exculpatory evi-

dence as required by the doctrine taught in *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), and *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963)?

V. Did the security procedures employed by the court deny appellants a fair trial?

VI. Was the evidence sufficient on the conspiracy charge to sustain the guilty verdicts against appellant Martin?

### I.

■ It is undisputed that the government did not immediately inform the grand jury, the court, or the appellants of Porter's perjury before the grand jury. At the trial, Porter admitted that he had perjured himself. Appellants' counsel, after a lengthy cross-examination of Porter on the issue of perjury, moved to dismiss the indictment because the government had failed to conform its conduct to the requirements outlined in *United States v. Basurto*, 497 F.2d 781 (CA9 1974). The district court ruled that *Basurto* was distinguishable and offered to entertain a motion for a mistrial which would not reserve to appellants a double jeopardy defense. Likewise, the judge refused to grant a mistrial on his own motion.

On appeal, the appellants argue that *Basurto* is controlling and that the lower court should have allowed the motion to dismiss. We hold that *Basurto* is distinguishable.

In *Basurto*, a government witness testified before the grand jury as to defendant's activities in marihuana smuggling. An indictment was returned based, in substantial part, on this witness's testimony. Prior to trial, the witness informed the government that he had committed perjury before the grand jury. In fact, he told the government that a substantial part of all of his testimony was untrue. The government did inform opposing counsel of the perjury, but did not so inform the court or the grand jury. The trial proceeded on the indictment which was largely grounded on the perjured testimony.

*Basurto* can be distinguished in two important particulars: (1) an analysis of Porter's grand jury testimony convinces us that it was so far removed from the truth that it had nothing to do with the return of the indictment. In other words, when viewed in the light of the other testimony before the grand jury, the Porter testimony was immaterial; (2) assuming the materiality of Porter's testimony, nonetheless, the grand jury totally disregarded it, named him as a coconspirator and, manifestly, knew he had perjured himself. Obviously, the grand jury believed Lunsford's testimony in connection with Porter's widespread activities in the conspiracy and did not believe Porter's perjured testimony. Beyond doubt, the perjured testimony before the grand jury in *Basurto* was material. We quote from the opinion:

> "At the point at which he learned of the perjury before the grand jury, the prosecuting attorney was under a duty to notify the court and the grand jury, to correct the cancer of justice that had become apparent to him. To permit the appellants to stand trial when the prosecutor knew of the perjury before the grand jury only allowed the cancer to grow.

> "As we have noted above, *the perjury before the grand jury was material* because of the change in the law; all of Barron's grand jury testimony relating to the appellants' activities before May 1, 1971 was perjured. The grand jury, if it returned an indictment, might have done so under the Comprehensive Drug Abuse Prevention and Control Act of 1970, *supra* had it known of the perjury." 497 F.2d at 785. [Emphasis supplied].

The *Basurto* court went on to say that the due process clause of the Fifth Amendment is violated when a defendant has to stand trial on an indictment which the government knows is based partially on perjured testimony, material in nature. Additionally, the court noted that whenever the prosecutor learns of any perjury committed before the grand jury, he is under a duty "to immediately inform" the court and

opposing counsel. Furthermore, *Basurto* requires that if the testimony was material, the grand jury must be informed in order that appropriate action may be taken. Manifestly, what the *Basurto* court says with reference to *immediately informing* the court and opposing counsel is said in its supervisory capacity, rather than in a capacity of imposing a duty on the prosecutor to make such a disclosure.

Even assuming, as argued by appellants, that the government violated *Basurto* in failing to notify the court and opposing counsel, we do not believe that the case stands for the proposition that the indictment must here be dismissed. Since in *Basurto*, the government witness' testimony before the grand jury was material and the case could have been decided on that point alone, we suggest that what the court there said on the duty of a prosecutor to *immediately* inform court and counsel of the perjury, irrespective of materiality, is dictum. As stated, the perjury exposed in *Basurto* was material. Here, the contrary is true. The only sound reason for requiring the disclosure of immaterial perjured testimony before a grand jury is to give the defendants an opportunity to confront the witness with his perjured testimony. Here, appellants not only had the opportunity to read the grand jury testimony the day before the trial commenced, but went forward on cross-examination and exhaustively exposed to the jury, the perjury which Porter had committed before the grand jury.

Aside from the fact that *Basurto* is distinguishable, we believe that its requirement that the prosecutor has an obligation to immediately inform the court and opposing counsel is weakened if not destroyed by the Supreme Court decision in *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). In that case, Agurs was convicted of second degree murder for killing one Sewell with a knife during a fight. The evidence disclosed that after a brief interlude in an inexpensive motel room, Agurs repeatedly stabbed Sewell causing his death. The only question present was whether the prosecutor's failure to provide defense counsel with certain background information on Sewell was grounds for granting Agurs' new trial motion. In particular, the prosecution had failed to disclose Sewell's known prior criminal record that would have evidenced his violent character. Agurs sole defense was that Sewell had initially attacked her with the knife and that all of her actions had been in self defense. The issue was raised before the trial court some three months after a verdict of guilty by a motion asserting that the government had withheld this evidence and that such evidence was material to Agurs' defense. The government opposed the motion for a new trial and after considering the matter, the district court denied it.

While *Agurs* is not a grand jury case, that fact in our view is not important. The Supreme Court there proceeded to consider whether the prosecutor has a constitutional duty to volunteer exculpatory matter to the defense and, if so, what standards of materiality gives rise to the duty. In this connection, the Court noted that it was dealing with the defendant's right to a fair trial mandated by the due process clause of the Fifth Amendment to the Constitution and to the comparable clause in the Fourteenth Amendment applicable to trials in state courts. From there the Court advanced to the conclusion that unless the omission deprived a defendant of a fair trial, there was no constitutional violation requiring that a verdict be set aside and, absent a constitutional violation, there was no breach of the prosecutor's duty to disclose. The Court then noted that the court of appeals must have assumed that the prosecutor had a constitutional obligation to disclose *any information* that might affect the jury's verdict. In commenting upon this assumption, the Court noted that such a constitutional standard would approach the "sporting theory of justice" which the Court expressly rejected in *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Finally, the *Agurs* Court went on to conclude that it did not believe that the constitutional obligation is measured by the moral culpability or the willfulness of the prosecutor.

It held that if the suppression of evidence results in constitutional error, it is because of the character of the evidence, not the character of the prosecutor. The *Agurs* Court emphasized that if the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error had been committed and that in making that determination, the omission must be evaluated in the context of the entire record. 427 U.S. at 112, 96 S.Ct. 2392.

We can find no logical reason to say that the tests in *Agurs,* a case dealing with a failure to disclose exculpatory evidence, should not apply to our facts where incomplete disclosure of the perjured testimony before the grand jury in no way suggested an absence of guilt on the part of the appellants. For that matter, the Porter grand jury testimony was just to the contrary. Manifestly, a greater duty should be placed on a prosecutor to produce exculpatory evidence than to disclose evidence which could be used for impeachment purposes only.

█ Here, Porter's grand jury testimony was produced on the day before the trial. On cross-examination, his perjury was exhaustively exposed by appellants' counsel. In other words, the record clearly establishes that appellants' convictions were not in any way affected by the failure of the prosecutor to disclose the perjured grand jury testimony. For that matter, it appears from the entire record that appellants were guilty beyond a reasonable doubt and the jury so found, even though being fully aware of Porter's perjury. In summary, *Agurs* holds (1) that a prosecutor will not violate the constitutional duty of disclosure unless his omission is sufficiently significant to result in the denial of a defendant's right to a fair trial, (2) the mere possibility that an item of undisclosed information might have aided the defense, or might have affected the outcome of a trial, does not establish "materiality" in the constitutional sense, (3) the prosecutor's constitutional duty of disclosure is not measured by his moral culpability or willfulness. If the suppression of evidence results in constitu-

tional error, it is because of the character of the evidence, not the character of the prosecutor, (4) the proper standard of materiality of undisclosed evidence is that if the omitted evidence creates a reasonable doubt of guilt that did not otherwise exist, constitutional error has been committed. Under the standards outlined in *Agurs,* the prosecutor's failure to disclose to the grand jury, the court or counsel, the perjury of Porter prior to the day before trial, did not constitute constitutional or other error.

A Ninth Circuit case more recent than *Basurto* is *United States v. Bowers,* 534 F.2d 186 (CA9 1976), *cert. denied* 429 U.S. 942, 97 S.Ct. 360, 50 L.Ed.2d 311. There a witness testified before the grand jury that the defendant's companion had told him that the companion and defendant had shot a park service ranger. The same witness at another trial testified that the companion had told him only that the defendant had shot the ranger. The court held that any failure of the prosecutor to notify the court and the grand jury of the change in the witness's testimony was harmless beyond a reasonable doubt because both versions of the testimony implicated the defendant and the defense counsel, while aware of the alleged perjury before the trial, failed to move for dismissal of the indictment. Here, as in *Bowers,* Porter's testimony, both before the grand jury and at trial, implicated all the appellants. Here, as in *Bowers,* the defense counsel were aware or should have been aware of the alleged perjury before the trial, but, nonetheless, failed to make a motion to dismiss the indictment prior to the trial. In *Bowers,* it is said:

"Assuming *United States v. Basurto,* 497 F.2d 781, 785 (9th Cir. 1974), applies, the failure of the prosecutor to notify the court and the grand jury of the change in Phillips' testimony was harmless beyond any doubt. Both versions of Phillips' testimony implicated Bowers. Appellant's counsel was aware of the alleged perjury well before trial, but made no motion to dismiss the indictment." 534 F.2d at 193.

On our facts, *Bowers,* rather than *Basurto,* would control.

Appellants do not argue that they made a specific request for *Brady* material prior to trial or during the course of the trial. For that matter, they had everything they wanted when the grand jury testimony was presented. That a general request for *Brady* ⸱material is insufficient for reversal where the evidence, if produced, would not create a reasonable doubt of the appellant's guilt is held as recently as *United States v. Hearst*, 563 F.2d 1331, 1351 (CA9 1977). The district court did not err in denying the motion to dismiss the indictment.

## II.

█ Under this assignment of error, appellants Martin and B. Bracy argued that the evidence at trial proved, as a matter of law, that there were several conspiracies, rather than just one. Both argue that they were not involved in certain of the transactions and that insufficient evidence exists to create one conspiracy. B. Bracy says she was not involved in the February 17, 1975, arrest, the March 17, 1976, incident, and the March 20, 1976, incident. Martin says she did not take part in the February, 1975, arrest, the January 16, 1976, incident, and the March 17, 1976, incident. Both argue that their participation, if any, in the March 20, 1976, incident was totally innocent.

We have spoken many times on the standard for determining if one or several conspiracies exist. *United States v. Kearney*, 560 F.2d 1358 (C.A.9 1977); *United States v. Perry*, 550 F.2d 524 (CA9 1977), *cert. denied* — U.S. —, 98 S.Ct. 104, 54 L.Ed.2d 85, and *United States v. Baxter*, 492 F.2d 150 (CA9 1973), *cert. denied* 416 U.S. 940, 94 S.Ct. 1945, 40 L.Ed.2d 292 (1974), are our most recent cases on the subject.

In *Baxter*, a case involving the appellant and seven other persons, the court applied the following rationale from *Blumenthal v. United States*, 332 U.S. 539, 557–558, 68 S.Ct. 248, 92 L.Ed. 154 (1947):

"For it is most often true, especially in broad schemes calling for the aid of many persons, that after discovery of enough to show clearly the essence of the scheme and the identity of a number participating, the identity and the fact of participation of others remain undiscovered and undiscoverable. Secrecy and concealment are essential features of successful conspiracy. The more completely they are achieved, the more successful the crime. Hence the law rightly gives room for allowing the conviction of those discovered upon showing sufficiently the essential nature of the plan and their connections with it, without requiring evidence of knowledge of all its details or of the participation of others. Otherwise the difficulties, not only of discovery, but of certainty in proof and of correlating proof with pleading would become insuperable, and *conspirators would go free by their very ingenuity.*" *Baxter, supra*, at 158, n. 7. [Emphasis supplied].

Continuing, the *Baxter* court said that although the government had failed to prove direct contact and connivance between the defendant retailers, nonetheless:

". . . if each knew, *or had reason to know*, that other retailers were involved with the Hernandez organization in a broad project for the smuggling, distribution and retail sale of narcotics, *and had reason to believe* that their own benefits derived from the operation were probably dependent upon the success of the entire venture, the jury could find that each had, in effect, agreed to participate in the over-all scheme. This would be true *even though the individual defendants were not aware of the identity, number or location of the other participating retailers.*" *Baxter, supra*, at 158. [Citations and footnote omitted]. [Emphasis supplied].

More recent Ninth Circuit cases speaking to the same rule are *United States v. Kearney*, 560 F.2d 1358 (CA9 1977), and *United States v. Perry*, 550 F.2d 524 (CA9 1977).

The *Perry* court at page 531 distinguished *Kotteakos v. United States*, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946), a case upon which appellants rely by saying: ". . . Each one of the defendants knew or should have known that other retailers were involved and that each had reason to believe

that what benefits he received were probably dependent upon the success of the entire venture."

The *Kearney* court, the most recent Ninth Circuit authority, when addressing the subject, said: "It need not even be shown that an alleged co-conspirator knew all of the purposes of and all of the participants in the conspiracy." [560 F.2d 1362]. Keeping in mind the standards stated in the foregoing authorities, we briefly outline the involvements of Martin and B. Bracy.

Although B. Bracy was not directly involved in the February 17, 1975, arrest or the March 17, 1976, incident, her overall activity is undisputed. She is A. Bracy's sister and A. Bracy was the central figure in each incident. Her phone records indicate numerous calls to Manning, the Mexican connection in the ring. During late January, 1976, she, Porter, Lomas, and A. Bracy were involved in smuggling a large quantity of heroin and cocaine into the United States from Mexico. She also personally met with Manning in Tijuana. She was involved in the March 20, 1976, incident to the extent that Chong phoned her and reported that Stephanie Gurley had been arrested. She arranged money for Porter's legal expenses. When Porter called her in his attempt to extort money from the drug ring in exchange for his silence before the grand jury, she referred him to Detroit. We hold these connections were sufficient under the foregoing authorities.

We reach a similar conclusion with respect to appellant Martin. She was involved in the January, 1976, incident to the extent that she tried to persuade Porter to return the cocaine he had kept as security. She was an active participant in both the March 17th and 20th operations, even though she did not physically transport the drugs. The only involvement to which there is some doubt is the February 17, 1975, arrest. Although no firm nexus existed between Martin and Canada, they were both girl friends of A. Bracy and both sought the return of the withheld cocaine from Porter. Additionally, the court instructed the jury that they were not to consider any act ". . . unless you should find beyond a reasonable doubt that the person doing the act, making the declaration, was a member of the same conspiracy as was the defendant." This instruction conforms to the rules stated in *United States v. Griffin*, 464 F.2d 1352 (CA9 1972), cert. denied 409 U.S. 1009, 93 S.Ct. 444, 34 L.Ed.2d 302, where the same question was raised. This assignment is without merit.

### III.

■ Under this heading, appellant B. Bracy points to various statements by government counsel in its closing argument which she says were prejudicial and contends that they denied her a fair trial. We have carefully examined the complaints and hold that none of them, or in sum total, measure up to conduct which could possibly be viewed as prejudicial. For that matter, it would seem that in each instance, there was evidence to support directly or inferentially the prosecutor's statement. *United States v. Escoto-Nieto*, 417 F.2d 623 (CA9 1969), cited by appellant is not in point. Here, the record is replete with references to the value of the smuggled narcotics, as well as the expected payment for bringing or transporting the drugs to major cities in the United States. This assignment is groundless.

### IV.

■ It is claimed that the prosecutor refused to disclose exculpatory evidence under the doctrine taught in *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Here, all of the grand jury and the Jencks Act testimony was produced. Here, there is no claim that the jury was prevented from hearing favorable evidence on the issue of guilt or that the jury was not advised of government promises, rewards, or assistance provided to government witnesses. The jury was made fully aware of all evidence of a favorable or impeaching nature prior to the case being submitted to them for decision. Thus, there can be no claim of prejudice. *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392,

49 L.Ed.2d 342 (1976). Even conceding non-disclosure, the prosecutor did not violate a constitutional duty, unless his omission is sufficiently significant to result in the denial of the defendant's right to a fair trial. *United States v. Agurs, supra.*

## V.

 Appellant B. Bracy argues that the number of United States Marshals present at the trial suggested that appellants in some way intended to harm the government witness, Porter. She says that this deprived her of the presumption of innocence, due process of law, and an impartial jury. Since the officers were not in uniform and the case did involve the testimony of a witness who had been threatened, it was certainly not an abuse of the district court's discretion to permit tight trial security. *United States v. Clardy,* 540 F.2d 439 (CA9 1976), *cert. denied* 429 U.S. 963, 97 S.Ct. 391, 50 L.Ed.2d 331.

## VI.

Martin urges that there was insufficient evidence to support the verdict against her. As we have said time and time again, we must evaluate the evidence in the light most favorable to the government. *United States v. Glasser,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942). Likewise, we have said time and time again that once the existence of a conspiracy has been established only slight evidence is necessary to connect the specific defendant to it. *United States v. Valdovinos,* 558 F.2d 531 (CA9 1977); *United States v. Costey,* 554 F.2d 909 (CA9 1977); *United States v. Westover,* 511 F.2d 1154 (CA9 1975), *cert. denied* 422 U.S. 1009, 95 S.Ct. 2633, 45 L.Ed.2d 673. Needless to say, the proof of guilt must be beyond a reasonable doubt. *United States v. Dunn,* 564 F.2d 348 (CA9, Nov. 11, 1977, as modified Nov. 16, 1977). This claim is meritless. Even her own brief recites ten individual links between her and the principal conspirators. For that matter, there is substantial evidence placing her in the vortex of the conspiracy.

## CONCLUSION

Our examination of the record convinces us that each of the appellants had a fair trial and that the judgments of conviction should be affirmed.

IT IS SO ORDERED.