**UNITED STATES of America, Plaintiff-Appellee,**

v.

**William THOMAS, Defendant-Appellant.**

**No. 77–3323.**

United States Court of Appeals, Ninth Circuit.

Nov. 9, 1978.

---

John W. Lundin (argued), Seattle, Wash., for defendant-appellant.

Harry J. McCarthy, Asst. U. S. Atty. (argued), Seattle, Wash., for plaintiff-appellee.

Before WRIGHT and CHOY, Circuit Judges, and WEIGEL *, District Judge.

CHOY, Circuit Judge:

William Thomas appeals from a jury verdict convicting him of one count of conspiracy to possess and distribute heroin in violation of 18 U.S.C. § 2 and 21 U.S.C. § 846, and seven counts of using a communication facility in the commission of a conspiracy in violation of 21 U.S.C. § 843(b). We affirm.

I. *Facts and Proceedings Below*

On January 4, 1977, appellant Thomas, seven codefendants, and eight other coconspirators were named in a thirty-two count indictment. Count one charged codefendants Richard Avery, Edsel Newbins, Jeannette Haydel, Jeffrey Jackson, Calvin White, Richard Williams, William Tann and William Thomas with knowingly and unlawfully conspiring to distribute, and to possess with intent to distribute, heroin during the period March 4, 1976 to October 21, 1976. The remaining counts, seven of which named appellant, charged the unlawful use of a communication facility in the commission of the conspiracy.

---

* The Honorable Stanley A. Weigel, United States District Judge for the Northern District of California, sitting by designation.

Six of the eight persons charged as codefendants pleaded guilty to the "telephone counts," with only Thomas and Tann opting for trial. At the conclusion of their joint trial, Tann was acquitted of all counts, while Thomas was convicted of all counts. Appellant received a total sentence of five years imprisonment: he was sentenced to four years on the conspiracy count, and one year on the first of the seven "telephone counts," the sentences to run consecutively. He was also sentenced to one year on each of the remaining "telephone counts," to run concurrently with each other and with the sentence on the conspiracy count.[1]

The indictment was based upon evidence from an investigation conducted during the period 1974 to 1976 by the Drug Enforcement Administration (DEA). The investigation focused on Avery, who was suspected of being the hub of a heroin distribution system in the Seattle-Tacoma area. A court-ordered wiretap of Avery's residence was authorized on September 30, 1976, resulting in the recording of 867 conversations between October 1 and October 20, 1976.

The Government's evidence, including the tape-recorded conversations, disclosed that Avery was indeed involved in a conspiracy with others named in the indictment to purchase heroin in Southern California and distribute it to wholesale dealers in the Seattle-Tacoma area. One of these wholesale dealers was Newbins, who provided Haydel, White and Jackson with heroin to be diluted, packaged and distributed on the street. At trial, the Government endeavored to show that Thomas was involved in this scheme through his efforts to obtain a temporary supply of heroin for the other conspirators while the main source, Avery, was away purchasing more heroin in Southern California.

On or about October 1, 1976, Avery, accompanied by Williams, Williams's wife and a female acquaintance, traveled to Southern California to purchase heroin from one William Gomez. The Government theorized that while Avery was out of town, Newbins ran short of heroin and turned to Thomas for an interim source of supply; Thomas attempted to accommodate him and others in the conspiracy. The evidence supporting this consisted of, *inter alia*, phone conversations that took place on October 2 and 3 between an individual calling himself "Merrick"—identified at trial as Thomas[2]—and several others including Newbins, Haydel and White. These conversations, together with eyewitness testimony of DEA agents, constituted the Government's principal evidence of appellant's participation in the Avery distribution conspiracy.

In addition, other significant evidence was introduced for the purpose of proving Thomas's connection with the conspiracy. This included a list finder directory seized from Avery's house pursuant to a warranted search, containing Thomas's phone number (listed under the name "Bill Merrick") as well as the names and phone numbers of other coconspirators; a "little black book" seized from Avery's person, also listing Thomas's phone number under the name "Merrick"; and one of Thomas's business cards, seized from appellant's wallet after his arrest. Written on the reverse of the business card was the name "Rich" and Richard Avery's phone number—the same number intercepted by the Government's wiretap.

On appeal, Thomas raises three objections: (1) that the evidence was insufficient to support his conviction; (2) that the proof established, if anything, his involvement in a separate conspiracy and not his participation in the Avery distribution scheme; and (3) that permitting a DEA agent to identify his voice as that of "Merrick" constituted reversible error.

## II. *Sufficiency of the Evidence*

We reject Thomas's contention that the evidence at trial was insufficient to support

---

1. After failing to appear for his original sentencing, Thomas was indicted and convicted of jumping bail in violation of 18 U.S.C. § 3150. He received an additional sentence of eighteen months, to run consecutively with his other sentences, for this offense.

2. *See* Part IV and note 21 *infra*.

his conviction. The jury could reasonably have concluded beyond a reasonable doubt both that Thomas was connected to the Avery conspiracy to possess and distribute heroin in the Seattle-Tacoma area, and that he utilized a communication facility in furtherance thereof.

### A. The Conspiracy Count

In determining whether evidence is sufficient to link a defendant to a conspiracy, this court has invoked the slight evidence rule, interpreted as follows:

> Once the existence of a conspiracy is established, evidence establishing beyond a reasonable doubt a connection of a defendant with the conspiracy, even though the *connection is slight*, is sufficient to convict him with knowing participation in the conspiracy. Thus, the word "slight" properly modifies "connection" and not "evidence." It is tied to that which is proved, not to the type of evidence or the burden of proof.

*United States v. Dunn*, 564 F.2d 348, 357 (9th Cir. 1977) (emphasis in original; footnote omitted). Thomas does not dispute the existence of the Avery distribution scheme, but only his connection with it. Thus, the only issue is whether the evidence was sufficient to establish beyond a reasonable doubt that Thomas had a slight connection to the Avery conspiracy proved. *See United States v. Bracy*, 566 F.2d 649, 659 (9th Cir. 1977); *United States v. Garcia-Rodriguez*, 558 F.2d 956, 960 (9th Cir. 1977), *cert. denied*, 434 U.S. 1050, 98 S.Ct. 900, 54 L.Ed.2d 802 (1978); *United States v. Valdovinos*, 558 F.2d 531, 533 (9th Cir. 1977). Viewed in the light most favorable to the Government, *see Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942), the evidence linking Thomas to the conspiracy was sufficient to enable the jury to conclude beyond a reasonable doubt that his connection was far more than "slight." The following acts performed by Thomas, which may either be inferred from or were directly proved by the evidence at trial, substantiate our decision on this issue:

1. *Thomas picked up or delivered heroin during a visit to Newbins at Avery's house on October 2, 1976.* On October 2, Newbins was measuring and preparing heroin for distribution.[3] This took place at Avery's house, where there were customers waiting during the day.[4] Avery was away buying heroin in California, and called during the afternoon to advise Newbins that he was "getting everything in shape, making sure everything is all right here." That night, Thomas—who had been at Avery's house the previous day[5]—phoned for Avery, ap-

---

3. On October 2, 1976, at 12:18 A.M., Haydel called Newbins at Avery's house. Newbins said he had not left the house yet because "I've just got a few more measurings to do" and there were two people left at the house still waiting. He said he didn't want to leave Avery's house because "I don't trust no one to . . . watch the dogs for me, you know?" and that "[a]s soon as I get done giving these puppies a bath, I'm going to dry them off and split." Newbins also stated, "I've just had a few of these puppies."

At trial, DEA agent Cloke testified that "many slang terms . . . are utilized by . . . people that are involved in narcotics in this area . . . . The word heroin has never been used in a conversation involving the purchase of heroin; instead dealers . . . use . . . the terms: stuff, smack, boy, dog, . . . ." Cloke also testified that "when engaged in a conversation where other people may listen, other codes are utilized . . . . ."

The inference that Newbins was in fact then measuring, diluting, and packaging heroin for distribution at Avery's house is also supported by the fact that two opiate testing kits, quantities of lactose (a substance apparently used in diluting heroin for purposes of better injection, the prevention of overdoses, and increased quantity for resale profitability), other narcotics paraphernalia, and $3,000 hidden away were later seized from Avery's house. *See* note 15 *infra*.

4. In the same conversation referred to in note 3 *supra*, Newbins said, "there's only two people left and the dogs, you know what I'm talking about, and I'll come down."

5. On October 1, 1976, at 3:20 P.M., appellant—identifying himself as Bill Thomas and giving his own office phone number—charged a call to that number from Avery's house.

parently to see if he had returned;[6] since Newbins was still there, he answered the phone. Upon learning it was Thomas calling,[7] Newbins asked him to come over, stating that it was "quite important" and that it would be to Thomas's benefit. DEA agents then saw Thomas drive from Avery's house and subsequently travel to another location where Thomas supplied another conspirator, Jackson, with fifty dollars' worth of heroin.[8]

2. *Thomas transported and supplied heroin to conspirator Jackson on October 3, 1976.* During the early hours of October 3, DEA agents saw Thomas drive from Avery's house to the apartment of conspirators Haydel and White, followed by another car. The occupants of both vehicles were seen entering the Haydel-White apartment. Subsequent evidence established that at this time Thomas sold Jackson fifty dollars' worth of heroin, which Jackson then injected—an act that Haydel revealed in a later intercepted phone conversation.[9]

3. *Thomas arranged to purchase heroin for Newbins and other conspirators from a third party.* These arrangements are directly inferable from several intercepted phone conversations played at trial. For example, in one of the tapes Thomas instructed Newbins to get "up front money" so they could "take care of business with[in] the next 45 minutes or hour, otherwise we're going to have to wait until four or five; he's taking his kids to the mountains." When the terms for the heroin purchase were finally agreed upon, however, Newbins and the third-party seller could not settle on where the transfer was to take place.[10] Thus, the deal Thomas arranged fell through.

4. *Thomas later attempted to purchase heroin for Newbins and other conspirators from another source, but the transaction was not consummated because the price was too high.* In taped conversations Thomas himself stated that he "worked all day and all night to get everything organized," and that "things didn't come down right today . . . but the dude wants such an outrageous bunch of bread for it, maybe it's best not to do business with him anymore." [11]

---

6. Appellant began the conversation: "Hello, this Merrick, is Rich in?"

7. Appellant and Newbins had some initial difficulty getting their aliases straight. Thomas stated, "we gotta get our names right, huh?"

8. *See* note 9 *infra.*

9. On October 3, 1978, at 11:11 P.M., White called Haydel and said, "Jeff owes . . . what your name? What? Merrick, ah, what, fifty something dollars . . . [for] shooting up last night. Or did he forget, I watched him do it. . . . He sure did [say he's going to charge you], I heard him."

10. On October 3, 1978, at 7:39 P.M., the following conversation took place between Thomas and Newbins:

T: "The people are back just a waiting for you now."
N: "Why don't you bring the stuff over here?"
T: "It's kind of a hard situation, to do it that way."
N: "Well everything's here . . . so why don't you bring it over here?"
T: "I'll have to see, the people are kind of weird, they don't want to go anywhere and meet nobody or something so I'll have to rap it over and see what they come up with . . . ."

11. After Thomas and Newbins discussed the heroin deal Thomas was making with the person who was going to "take his kids to the mountains," Thomas phoned Newbins to inform him that "the people took off . . . I couldn't stall them off . . . I'm going to look . . . at something else, and if I get that together sooner, I'll get ahold of you on that." Thomas's statement in a later call about the "dude [who] wants such an outrageous bunch of bread" thus suggests that this was a different transaction and an entirely different individual. That this was a separate transaction is also evidenced by the fact that the attempted deal with the people who retreated to the mountains ultimately broke down because the parties failed to agree on a location where the transfer could take place, whereas the later deal fell through because of price.

In a subsequent call between Thomas and Newbins, Thomas said: "Yeah, I've been up . . . here trying to work something out and ah, about the only thing ah you can do is go over there, pay for it and ah . . . ." Newbins, however, responded that "the bread's here," and indicated he was not willing to go to meet the sellers but rather wanted them to come to him.

5. *Thomas again agreed to supply several of the conspirators with heroin.* In another intercepted telephone conversation Thomas agreed that he and others would "have that QP at 10:00 in the morning."[12]

6. *Thomas served as an intermediary for White and Newbins.* Eyewitness testimony by DEA agents established that in the early hours of October 3 and 4, while Avery was out of town, Thomas traveled back and forth between Avery's residence, where Newbins was staying, and the Haydel-White apartment.

Furthermore, substantial additional evidence connected Thomas to the conspiracy. Evidence such as the business card from appellant's wallet with Avery's name and phone number written on the back and Avery's telephone directories listing appellant linked him to the Avery conspiracy by virtue of the common appearance of aliases and the interchange of phone numbers. Thomas's relationship with others in the conspiracy was established by evidence of a variety of continuing contacts with them, including a visit to Avery's house the day before his dealings outlined above transpired,[13] a first meeting with Avery's roommate "quite a long time" before trial and at least one subsequent meeting at Avery's house, which other conspirators frequented,[14] and numerous calls to Avery's house from appellant's business phone during September and October, 1976.

Finally, based on the evidence of narcotics items seized from Avery's residence,[15] which Thomas frequented along with other coconspirators, it is implausible that he did not know the nature and purpose of the conspiracy and the involvement of the others in it. The evidence on the conspiracy count was sufficient.[16]

### B. The "Telephone Counts"

The jury found Thomas guilty on all seven of the "telephone counts," charging him with use of a communication facility in furtherance of the conspiracy. He asserts that the evidence was insufficient to support his conviction on these counts for four reasons.

■ First, Thomas argues that in none of the conversations supporting these counts did he use the word "heroin" or any other established synonym. However, narcotics code words have repeatedly been recognized as a commonly used tool of parties to a conspiracy. *See United States v. Abascal,* 564 F.2d 821, 827 (9th Cir. 1977), *cert. denied,* 435 U.S. 953, 98 S.Ct. 1583, 55 L.Ed.2d 804 (1978); *United States v. Mejias,* 552 F.2d 435, 437–38, 445 (2d Cir.), *cert. denied,* 434 U.S. 847, 98 S.Ct. 154, 54 L.Ed.2d 115 (1977); *United States v. Chavez,* 533 F.2d 491, 494 (9th Cir.), *cert. denied,* 426 U.S. 911, 96 S.Ct. 2237, 48 L.Ed.2d 837 (1976); *United States v. Sisca,* 503 F.2d 1337, 1343 (2d Cir.), *cert. denied,* 419 U.S. 1008, 95 S.Ct. 328, 42 L.Ed.2d 283 (1974). In *Sisca,* the Second Circuit held that the use of "narcotics code" was properly considered by the jury to support the inference that the

12. DEA agent Cloke testified that a "quarter piece" was a quarter ounce of heroin or other drug. The "QP" that Thomas was supposed to supply was also referred to in the same taped conversation as a "quarter piece" when White said to Haydel, before Thomas got on the phone: "Jeff [said] that . . . [Thomas] said that they said that . . . they'd be back in the morning at 10:00 with a quarter piece . . . .. The fifty dollars was supposed to come out . . . for sampling on the dope that he was gonna get a quarter of."

13. *See* note 5 *supra.*

14. In addition to her testimony concerning meetings with appellant, the woman Avery lived with stated that Newbins, Tann and Hay-del were also at Avery's house during the month of October, 1976.

15. On October 20, 1976, two opiate test kits, two bottles of lactose, and two prophylactics tied for heroin packaging were seized from Avery's house. In addition, $3,000 in cash was found hidden in a false compartment in a vanity drawer. *See* note 3 *supra.*

16. "This is not to say, of course, that a conviction would be compelled by this evidence, but the combination and timing of events here is too suggestive of guilt for a judge to take the question from the jury . . . .." *United States v. Rosales,* 584 F.2d 870, 873 (9th Cir. 1978) (footnote omitted).

defendant was an active participant in the conspiracy charged. Here, in the context of the other intercepted conversations played at trial and the other evidence in the case, the jury similarly could properly infer from appellant's cryptic language that the focus of the conversations was upon the narcotics transactions in furtherance of the overall conspiracy that were proved at trial.

■ Second, relying on *United States v. Murray*, 492 F.2d 178, 187 (9th Cir. 1973), *cert. denied*, 419 U.S. 854, 95 S.Ct. 98, 42 L.Ed.2d 87 (1974), appellant claims that the Government failed to present independent evidence connecting each telephone call to a particular narcotics transaction. This claim is without support; each call is connected to a particular transaction by the context of other calls and other evidence surrounding it.[17] Moreover, appellant's reliance on *Murray* to impose such a requirement on the Government is misplaced. In that case, two of the defendants were convicted on the theory that certain persons who actually used the telephone were their agents; it was not the defendants', but others' voices that were recorded. Their convictions were reversed because there was insufficient evidence linking the calls intercepted to the defendants themselves. Here, in contrast, Thomas's voice and alias were identified in all seven of the calls for which he was indicted.

■ Third, appellant relies on *United States v. Leslie*, 411 F.Supp. 215 (D.Del. 1976), for the proposition that the Government was required to show that heroin was actually distributed by the conspiracy to establish a violation of 21 U.S.C. § 843(b). In *Leslie*, the district court indeed dismissed a § 843(b) charge on the ground that the distribution of drugs was not proved. However, *Leslie* is clearly distinguishable in that the felony allegedly facilitated was distribution of drugs, whereas the telephone counts in this case alleged furtherance of the separate and distinct offense of conspiracy. *See United States v. Carman*, 577 F.2d 556, 567 n.12 (9th Cir. 1978) ("conspiracy is a separate and distinct offense; . . . Completion of the objective is not an element of [the] conspiracy"). The fact that

---

**17.** A brief synopsis of the telephone calls upon which the seven "telephone counts" (counts 9–12, 14, 16 and 18 of the indictment) were based demonstrates both that the jury could reasonably conclude that the calls were made in furtherance of the conspiracy and their connection to the acts described in Part IV.A. *supra*:

Count 9—This was the sole "telephone count" to run consecutively to the conspiracy sentence. In this call between appellant and Newbins, the conversants first agreed that they must get their aliases straight. *See* note 7 *supra*. It is in this conversation also that Newbins asked to see Thomas, stating that it was "quite important" and that it would be to Thomas's "benefit." Thomas subsequently did so, apparently picking up or delivering heroin at that time. *See* Part IV.A.1. *supra*. Apparent narcotics code language such as "that thing," "babies," and "children" is used throughout the conversation.

Count 10—In this conversation between Thomas and Newbins, arrangements were made to "take care of business," and the need for "up front money" was discussed. *See* Part IV.A.3. *supra*.

Count 11—Thomas advised Newbins by phone to "put up the bread" and the two made further arrangements to meet. This call was made in the course of Thomas's apparent efforts to set up a heroin purchase for Newbins. *See* Part IV.A.3. *supra*.

Count 12—Thomas told Newbins that certain prospective sellers had left and that he would pursue other possibilities, stating, for example: "Those people took off, man, I couldn't stall them off . . . . I'm going to look, go look at something else, and if I can get that together sooner, I'll get ahold of you on that." Later, these people came back but they and Newbins could not agree on price. *See* Part IV.A.3. and note 11 *supra*.

Count 14—Thomas called Newbins to relate that "the people are back, just a waiting for you now." Newbins asked Thomas to "bring the stuff over here," to which Thomas responded that "the people are kind of weird, they don't want to . . . meet nobody . . ." *See* Part IV.A.3. and note 10 *supra*.

Count 16—Thomas called Newbins, again to finalize plans for the transaction described in Part IV.A.3. *supra*. Thomas told Newbins that the latter would have to travel to where the "people are located" and "pay for it."

Count 18—Thomas, who was then with Newbins, spoke with White by phone in an attempt to secure payment for fifty dollars' worth of "dope" that Thomas supplied to Jackson the previous evening. *See* Part IV.A.2. and note 9 *supra*.

several of the arrangements Thomas made over the telephone in furtherance of the conspiracy's objectives fell through is thus immaterial.

■ Fourth, appellant contends that by utilizing evidence of the recorded conversations to prove both the conspiracy count and the telephone counts, the Government has subjected him to double jeopardy and denied him due process. However, as this court stated in *United States v. Rodriguez*, 546 F.2d 302, 307 (9th Cir. 1976):

> [A] conspiracy can be furthered by overt acts, some of which may or may not be criminal in nature. If the former, an individual may be charged with both his participation in the separate criminal act which furthers the conspiracy, and for his participation in the conspiracy.

We thus find this contention to be without merit.

■ Finally, we note that six of the seven "telephone counts" were ordered to run concurrently to the conspiracy count. Since we have determined that appellant's conviction on the conspiracy count must be affirmed, under the concurrent sentence doctrine we need not consider his objections to these six counts. *See, e.g., United States v. Weiner*, 578 F.2d 757, 776 (9th Cir. 1978); *United States v. Walls*, 577 F.2d 690, 699 (9th Cir. 1978); *United States v. Ingman*, 541 F.2d 1329, 1331 (9th Cir. 1976). The phone call supporting the single telephone count that was to run consecutively to the conspiracy count was more than sufficiently proved to have furthered the conspiracy to support appellant's conviction for violation of 21 U.S.C. § 843(b).[18]

## III. Separate Conspiracies

Thomas contends that the Government alleged a single overall conspiracy in the indictment, yet proved two separate conspiracies at trial. He asserts that this variance between indictment and proof requires reversal of his conviction, relying on *Kotteakos v. United States*, 328 U.S. 750, 766–77, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946).

In *Kotteakos*, thirty-two defendants were charged with one overall conspiracy. At the close of the evidence, the jury was instructed that "[i]t is one conspiracy, and the question is . . . which of the defendants, are members." *Id.* at 767, 66 S.Ct. at 1249. However, the evidence showed "at least eight, and perhaps more, separate and independent groups, none of which had any connection with any other, though all dealt independently with [one central figure] as their agent." *Id.* at 754–55, 66 S.Ct. at 1243, *quoting United States v. Lekacos*, 151 F.2d 170, 172 (2d Cir. 1945), *rev'd sub nom. Kotteakos v. United States*, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). The Supreme Court held that given the evidence in the case, both the indictment and the judge's instruction were "plainly wrong," since "[t]he jury could not possibly have found . . . that there was only one conspiracy." *Id.* at 768, 66 S.Ct. at 1249. Because the error was not harmless, the seven convictions in *Kotteakos* were reversed.

In this case, unlike *Kotteakos*, only fifteen people were allegedly involved in the Avery conspiracy, and only eight individuals where charged in the indictment, six of whom pleaded guilty.[19] Indeed, as noted *supra*, appellant does not contest the existence of the Avery conspiracy, but only his

---

18. *See* note 17 *supra*.

19. As we noted in *United States v. Ingman*, 541 F.2d 1329, 1331 (9th Cir. 1976), "determining whether to indict for a single conspiracy or for separate ones requires the Government to make delicate judgments. Where separate trials are sought on the theory that there are multiple conspiracies involving disparate individuals with some interrelationships, charges of bad faith multiplicity or pleas of double jeopardy are likely to be raised on appeal. On the other hand, the Supreme Court, and lower federal courts, have disapproved the practice of trying different offenses involving a number of defendants at one trial."

Here, as in *Ingman*, "we are of the opinion that the Government accurately classified the facts," *id.*, and that the evidence justified both the indictment for a single conspiracy and the submission of the question of the existence of a single conspiracy to the jury. *See infra*.

connection to the Avery conspiracy proved. Moreover, the jury in this case was not instructed to find one conspiracy as was the jury in *Kotteakos.* Rather, the instructions carefully distinguished between single and multiple conspiracies. In addition, the judge specifically admonished the jury that if "two or more separate conspiracies have been proven, rather than the single conspiracy charged in the indictment, then you must acquit . . . ."

▇ Whether a scheme is one conspiracy or several conspiracies is ordinarily a question for the jury. *See United States v. Ricco,* 549 F.2d 264, 268 (2d Cir.), *cert. denied,* 431 U.S. 905, 97 S.Ct. 1697, 52 L.Ed.2d 389 (1977); *United States v. Rodriguez,* 509 F.2d 1342, 1347 (5th Cir. 1975); *Koolish v. United States,* 340 F.2d 513, 526 (8th Cir.), *cert. denied,* 381 U.S. 951, 85 S.Ct. 1805, 14 L.Ed.2d 724 (1965). Submitting the question to the jury in this case was proper, since a prima facie case of a single conspiracy was clearly presented. *See United States v. Rosales,* 584 F.2d 870, 373 374 & n.3 (9th Cir. 1978).

▇ To prove his participation in the single Avery conspiracy, the prosecution was required to show that Thomas agreed to effectuate that conspiracy's central criminal design: the distribution of narcotics in the Seattle-Tacoma area. *See Daily v. United States,* 282 F.2d 818, 820 (9th Cir. 1960). Specifically, the Government must have shown that Thomas knew this was in fact the purpose of the conspiracy, *see Marino v. United States,* 91 F.2d 691, 696 (9th Cir. 1937), and that he knew or had reason to know that the others were involved and that his own benefits from his dealings with them were probably dependent upon the success of the entire venture, *United States v. Kearney,* 560 F.2d 1358, 1362 (9th Cir. 1977); *United States v. Baxter,* 492 F.2d

150, 158 (9th Cir.), *cert. dismissed,* 414 U.S. 801, 94 S.Ct. 16, 38 L.Ed.2d 38 (1973). Because "a partnership in crime is seldom evidenced by a written agreement . . . among the partners," circumstantial evidence was sufficient for this purpose. *Daily v. United States,* 282 F.2d at 820. It was not necessary for the Government to prove that Thomas knew the exact scope of the conspiracy, the identity and role of each of the coconspirators, or the details of the operations or any particular plan. *See Blumenthal v. United States,* 332 U.S. 539, 557, 68 S.Ct. 248, 92 L.Ed. 154 (1947); *Marino v. United States,* 91 F.2d at 696. Proof that Thomas knew he was plotting in concert with others to violate the law was sufficient to raise the necessary inference that he joined in the overall agreement. *United States v. Kearney,* 560 F.2d at 1362.

▇ Again, viewed in the light most favorable to the Government, the evidence was sufficient to create a jury question on the existence of a single conspiracy.[20] *See United States v. Rosales,* 584 F.2d at 872, 873; *United States v. Bracy,* 566 F.2d 649, 657 -58 (9th Cir. 1977); *United States v. Perry,* 550 F.2d 524, 531 (9th Cir.), *cert. denied,* 431 U.S. 918, 97 S.Ct. 2182, 53 L.Ed.2d 228 (1977). Since the evidence was sufficient, the jury's determination on this issue must stand. *Moore v. Telfon Communications Corp.,* (9th Cir. June 9, 1978), slip op. at 1808.

IV. *Voice Identification*

Appellant contends that DEA agent White's testimony identifying appellant's voice as that of "Merrick" on certain taped conversations was improper opinion testimony by a lay witness, and violated both his fifth amendment right against self-incrimi-

---

**20.** *See* Part II and notes 3-15 *supra.* As we stated in *United States v. Kearney,* "[a]lmost any venture, criminal or legitimate, is analyzable into a series of bits . . . . The standard for determining the existence of a single conspiracy, however, ' . . . is whether there was one overall agreement among the various parties to perform various functions . . .' "

560 F.2d 1358, 1362 (9th Cir.), *cert. denied,* 434 U.S. 971, 98 S.Ct. 522, 54 L.Ed.2d 460 (1977), *quoting United States v. Hobson,* 519 F.2d 765, 775 (9th Cir.), *cert. denied,* 423 U.S. 931, 96 S.Ct. 283, 46 L.Ed.2d 261 (1975) *and United States v. Ellsworth,* 481 F.2d 864, 869 (9th Cir.), *cert. denied,* 414 U.S. 1041, 94 S.Ct. 544, 38 L.Ed.2d 332 (1973).

nation and his sixth amendment right to counsel.[21]

█ Under Fed.R.Evid. 901(b)(5),[22] voice identification to determine the admissibility of recorded conversations may be made by one who has heard the voice "at any time under circumstances connecting it with the alleged speaker." Lay opinion on this issue is permissible so long as the witness testifying has this requisite familiarity with the speaker. *See* Advisory Committee Notes, Fed.R.Evid. 901, 28 U.S.C.A. at 716 (example 5); *United States v. Vitale,* 549 F.2d 71, 73 (8th Cir.), *cert. denied,* 431 U.S. 907, 97 S.Ct. 1704, 52 L.Ed.2d 393 (1977). The prosecution established, prior to the admission of agent White's testimony and the introduction into evidence of the relevant tapes themselves,[23] that White had conversed with Thomas over the telephone on three separate occasions. This laid the requisite foundation of agent White's familiarity with the speaker. The voice identification by lay opinion testimony under these circumstances was proper.

█ We also reject appellant's contention that admitting agent White's testimony violated his fifth amendment right against compulsory self-incrimination. This court has stated that one's voice is "a physical characteristic," and that "requiring [a] suspect to speak, where doing so does not involve communicating what he knows" does not violate his fifth amendment rights. *Gilbert v. United States,* 366 F.2d 923, 937 (9th Cir. 1966), *cert. denied,* 393 U.S. 985, 89 S.Ct. 460, 21 L.Ed.2d 446 (1967). *See United States v. Wade,* 388 U.S. 218, 222–23, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967); *see also Gilbert v. California,* 388 U.S. 263, 266–67, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967). Nor were Thomas's fifth amendment rights violated because *Miranda* warnings were not given prior to the telephone conversations with agent White. Such a warning, as it relates to the fifth amendment, is designed to insure that incriminating statements are voluntarily made; whether appellant's statements were in any way compelled is irrelevant here since they were not used for their content. *Cf. Gilbert v. California,* 388

21. We note that there was substantial additional evidence at trial, to which appellant does not object, identifying him as "Merrick." This included the testimony of Avery's roommate both that she recognized appellant as "Merrick" and that she recognized his voice as that of "Merrick" on the tapes; Avery's telephone directories listing appellant's phone number under the name "Merrick"; a taped conversation in which appellant—identifying himself as Bill Thomas—charged the call to "my office number," the same number listed in Avery's directory under the name "Merrick"; and the testimony of DEA agents that appellant arrived at the Avery and Haydel-White residences shortly after the calls were made indicating that "Merrick" would do so.

22. Fed.R.Evid. 901 provides in part:
(a) *General provision.* The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.
(b) *Illustrations.* By way of illustration only, and not by way of limitation, the following are examples of authentication or identification conforming with the requirements of this rule:
\* \* \* \* \* \*
(5) *Voice identification.* Identification of a voice, whether heard firsthand or through mechanical or electronic transmission or record-

ing, by opinion based upon hearing the voice at any time under circumstances connecting it with the alleged speaker.

23. Thomas contends that White's testimony was admitted after the relevant tapes were introduced into evidence. Therefore, he argues, that testimony was erroneously considered under Fed.R.Evid. 901(b)(5), since it was offered not for the purpose of determining the admissibility of the tapes but rather for the purpose of enhancing their evidentiary worth. However, the trial transcript reveals that White's testimony in fact preceded the introduction of the tapes containing the incriminating "Merrick" conversations. Even were Thomas's contention correct, the district court had discretion to admit White's testimony under Fed.R.Evid. 701, permitting such lay opinion evidence rationally based on prior contacts and conversations with the person to be identified. *See United States v. Butcher,* 557 F.2d 666, 670 (9th Cir. 1977) (photo identification); *cf. United States v. Turner,* 528 F.2d 143, 163 (9th Cir. 1975) (lay voice identification after admission of tapes permissible under similar pre-federal rules standard requiring showing of basis for "reasonably accurate identification"), *cert. denied,* 423 U.S. 996, 96 S.Ct. 426, 46 L.Ed.2d 371 (1975) *and* 429 U.S. 837, 97 S.Ct. 105, 50 L.Ed.2d 103 (1976).

U.S. at 267, 87 S.Ct. 1951 (handwriting exemplars not "testimonial or communicative matter"). As the Supreme Court has observed, "the Fifth Amendment privilege against self-incrimination . . . 'offers no protection against compulsion to . . speak for identification . . . .'" *United States v. Wade,* 388 U.S. at 223, 87 S.Ct. at 1930; *quoting Schmerber v. California,* 384 U.S. 757, 764, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966).

Finally, appellant maintains that because these conversations with agent White took place after his indictment, they arose during a "critical stage" of the proceedings. Thus, he argues, given the prosecution's failure to show that *Miranda* warnings were delivered on these occasions, he was deprived of his sixth amendment right to counsel, and agent White's testimony derived from these conversations should have been excluded.

In *Gilbert v. California, supra,* the taking of handwriting exemplars was held not to be a "critical stage" of the proceedings in which a defendant is entitled to the assistance of counsel. The Court reasoned that the likelihood of an unrepresentative exemplar as a result of the absence of counsel was not great, and that any inaccuracy that might exist could be "brought out and corrected through the adversary process at trial" via " 'cross-examination of the [State's] expert [handwriting] witnesses . . . .'" 388 U.S. at 267, 87 S.Ct. at 1953; *quoting United States v. Wade,* 388 U.S. at 228, 87 S.Ct. 1926. In *Wade,* the Court distinguished between pretrial lineups—which were deemed susceptible to "risks of suggestion," 388 U.S. at 229, 87 S.Ct. 1926, and hence required the presence of counsel— and "compelling [the defendant] to speak within hearing distance of the witnesses, even to utter words purportedly uttered by the robber," *id.* at 222, 87 S.Ct. at 1930. And in *United States v. Ash,* 413 U.S. 300, 321, 93 S.Ct. 2568, 37 L.Ed.2d 619 (1973), the Court held that the sixth amendment does not grant the right to counsel at photographic displays for the purpose of identifying the offender.

 The determinant of whether counsel is required in these situations is whether the risk of prejudice in the particular identification procedure is such that "the absence of counsel might derogate from . . . a fair trial." *Gilbert v. California,* 388 U.S. at 267, 87 S.Ct. at 1953. We have recently held that the risk of prejudice is not sufficient to require the aid of counsel for pretrial voice identifications, and that these do not constitute "critical stages" of a criminal proceeding. *United States v. Kim,* 577 F.2d 473, 480–81 (9th Cir. 1978). Certainly, based on the foregoing authority, the absence of counsel during appellant's telephone conversations with agent White did not violate his sixth amendment rights.

AFFIRMED.